ALAN BUBIS and IRVIN WOLF, Appellees, v.
WILLIAM G. BLACKMAN, Appellant.
—435 S.W.(2d) 492.

Middle Section.  April 24, 1968.

Certiorari Denied by Supreme Court October 7, 1968.

Lawrence E. Levine, George H. Cate, Jr., Nashville, for appellees.

William J. Harbison, Trabue, Minick, Sturdivant & Harbison, Nashville, for appellant.

SHRIVER, P.J. This is a suit for specific performance of a contract to sell certain real estate belonging to defendant Blackman consisting of an apartment building constructed by defendant on land owned by him and located on White Bridge Road, Nashville, Davidson County, Tennessee, the contract price being $406,000.00.

This is the second appeal in the case, the first appeal being from the decree of the Chancellor ordering specific performance of the contract. In said first appeal this Court rendered an opinion and decree on December 10, 1966 in which the decree for specific performance was set aside and a decree for damages awarded. Our conclusions in the matter were stated as follows:

"We feel compelled to agree with the Chancellor that this experienced real estate man and builder signed the contract as it is shown in the record and should have known what he was doing, and the mere fact that his deal turned out to be unprofitable is not sufficient to defeat the rights of the complainants.

On the other hand, we think there is substantial evidence to indicate that the defendant either by oversight or for some reason not disclosed by the record, misunderstood the transaction with respect to the appliances, he being under the impression that the cost would be assumed by the buyers as was the case in a previous transaction handled by Wolf.

Taking into consideration all of these facts, we are persuaded to believe that the remedy of specific performance should not be enforced, but that justice can be accomplished by decreeing damages for breach of contract.

It, therefore, results that the findings of fact of the Chancellor are concurred in by this court and the judgment for complainants is affirmed insofar as it awards a decree for damages and provides a reference to the Master to determine the amount of damages sustained by reason of breach of contract, but the order for specific performance is denied.

Affirmed as modified, and remanded to the Trial Court for further proceedings consistent with this opinion.

/s/ Thos. A. Shriver"

There was no Petition for Certiorari to the Supreme Court and, on the remand after proof was taken as to damages on a reference to the Master, there was a decree awarding complainant Bubis damages in the amount of $77,507.50 and complainant Wolf a real estate commission of $20,300.00, from which decree the defendant Blackman duly perfected his appeal and has assigned errors.

## ASSIGNMENTS OF ERRORS

There are five assignments of error as follows:

1. The Chancellor erred in awarding damages based on an alleged difference between the contract price and market value of the apartments.

   This item of damages was $69,000.00. It was awarded over defendant's exception which rested upon principles of estoppel as well as upon the preponderance of the proof. Both complainants were permitted to abandon their former position and assert a large loss of bargain to the purchaser, despite a lack of pleadings on the subject and their totally irreconcilable testimony to the contrary.

2. The Chancellor erred in awarding complainant Wolf a commission in view of his obvious effort to negotiate a contract prejudicial to one principal and favorable to the other.

3. The Chancellor erred in holding that Blackman's exception to Wolf's commission was a mere re-argument of his former contentions on the first trial.

4. The Chancellor erred in not dismissing the suit entirely in view of the dual agency of Wolf who obviously was undertaking to serve the interests of Bubis at Blackman's expense, Bubis being chargeable with the conduct and acts of his own agent in the transaction.

5. The Chancellor erred in not allowing Blackman credit against the prorated rents for his interest, taxes and costs of operating prior to December 1, 1964.

The questions presented by the record and the assignments may be simply stated as (1) What amount of damages is complainant Bubis entitled to recover by reason of Blackman's breach of contract; (2) Is Wolf entitled to his real estate broker's commission of $20,300.00 to be paid by defendant Blackman?

## ON THE QUESTION OF DAMAGES

As seen from the foregoing quotation of a part of this Court's opinion on the former appeal, the question of liability of the defendant for damages for breach of contract is foreclosed and not subject to attack on the present appeal.

On the other hand, the question of the amount of damages as fixed by the court on remand is subject to serious question here. It is insisted by counsel for defendant, appellant, who will be referred to hereinafter as defendant, that in the record of the first appeal and on pre-trial depositions, both complainant, Bubis, and complainant, Wolf, testified unequivocally that the contract price of $406,000.00 was a fair price in every respect and if they had been kept up in good condition the apartments had a fair value equal to the contract price. As stated in the brief and argument of counsel for defendant, "This was their position deliberately taken when they were seeking specific performance."

However, after specific performance had been denied by this Court, both complainants testified that the apartment buildings and land were worth far in excess of the contract price, and that Bubis the purchaser had been damaged to the extent of the difference between the contract price and the then market price.

Mr. Wolf started out in the transaction as defendant's agent and therefore occupied a fiduciary relationship toward him. In spite of this, however, his testimony on remand was to the effect that the property at the time of the breach of contract was worth some $70,000.00 more than the price he had helped his principal Blackman obtain for it. At this point it might be also remembered that, although he represented Blackman, he first brought a proposition to Blackman from Bubis of $5,600.00 per unit for the apartments, and when Blackman refused this he promptly came back with a $5,800.00 per unit offer which Blackman accepted, and it was revealed that Bubis had authorized the $5,800.00 in the first place.

For these reasons it is insisted by defendant that Wolf should not be allowed to recover a commission.

We will come back to this proposition later but will continue our consideration of the award of damages.

In the Brief and Argument of Counsel for defendant the following argument is made:

"We submit that an outrageous and shocking result has been reached in this case, and one never even remotely contemplated by this Court when it rendered its opinion on December 10, 1966. Both complainants should have been repelled in their attempt to claim a difference between market price and the contract price, and their proof on this question taken on the remand should be disallowed, since on the first record they had expressly disavowed any such difference in value and had urged that the contract price was. fair, equitable and fully representative of the market value of the property."

In our opinion on the first appeal we found that there had been a misunderstanding by defendant Blackman as to how the cost of appliances in the apartments were to be handled, since Blackman had thought that this cost would be assumed by the purchaser in the same manner as was done in a prior transaction involving an apartment building sold by him and handled by his agent Irvin Wolf. It was partly for this reason that this Court denied specific performance and remanded the cause for fixing of damages.

On remand the Clerk and Master was directed to consider the proof already on file, together with such additional proof as the parties desired to take on the question of damages. Thereupon, complainants took further depositions of both Bubis and Wolf, plus the deposition of an appraiser, Felix Treadway. The defendant offered the testimony of Homer B. Gibbs, Jr., an appraiser, and that of Mrs. Blackman.

On considering the proof, the Clerk and Master reported that the apartments had a value on the date of the breach of $457,000.00 as against the contract price of $406,000.00, and he found that half of the rents collected prior to the closing date amounted to $8,507.50 which, together with the $69,000.00 difference in actual value as against the contract price, was awarded Bubis as damages. Wolf was given a judgment for $20,300.00 commission.

It is pointed out that neither the Clerk and Master nor the Chancellor commented on the previous testimony of the complainants and the Clerk and Master properly stated that the question of judicial estoppel was one of law for the Court. However, the Chancellor did not comment on it in his opinion or his decree.

It is urged by counsel for defendant that, on the record existing when the case was remanded, the position deliberately taken by complainants in sworn testimony, confined their claim for damages to an accounting for the rents collected and any loss of rents by reason of diverting tenants from the apartments prior to the scheduled closing date, plus the real estate agent's commission.

It is further argued that there was neither pleading nor proof to support a claim for damages for loss by reason of a difference in the contract price and the market value of the property on the date of the breach. On his pretrial deposition taken April 8, 1965, four months after the scheduled closing date of December 1, 1964, Bubis testified that at the time the contract to pay $406,000.00 for the apartments was set up he felt like it was a fair price for boh parties, but when asked if they were not worth more at that time than at the time the contract was made, he answered: "They may be worth more, but the apartment is secondhand, a used apartment now."

The foregoing statement seemed to imply that Bubis considered that the apartments were probably worth less at that time because of having been used or secondhand.

However, he later insisted that they were worth very much more by reason of being used and occupied. Thus, on February 28, 1967, he testified that he thought the value of the apartments at the time of closing, December 1, 1964 were worth "possibly $475,000.00 or $480,000.00 due to the fact that they were practically all rented." But, he stated that he was still willing to pay $406,000.00 for them but not the "latter sum you mentioned."

He further testified as follows:

"Q. Mr. Bubis, you remember giving other testimony in this case, do you not?

A. Yes, sir.

Q. And you recall stating in your discovery deposition that you thought $5800 a unit was a fair price for both parties?

A. $5800 was a fair price for the construction of the apartments.

Q. You said fair price for both parties, in your other testimony, did you not?

A. Yes, sir.

Q. You remember giving it in April, 1965, is that correct?

A. That is correct."

*On June 21, 1965,* on being questioned by his own solicitor, and while seeking specific performance on behalf of Bubis, Wolf testified.

"Q. Mr. Wolf, what would you say is the current value of the apartment?

A. Around $406,000.00."

On *April 8, 1965,* Mr. Wolf testified:

"Q. Did you say it was a good deal or a bad deal, or—?

A. I said $5,800 was a good deal, $5,600 was a good deal, too, but $5,800 is an even better deal for him. That's what he asked me to get for it, that's what we got.

Q. You felt like that is what they are worth?

A. That's what he asked for it, that's what they were worth.

Q. What are they worth now?

A. I haven't the slightest idea right now. I don't know the condition of them.

Q. Assuming they are in good condition, what are they worth?

A. Be worth $406,000.00."

*However, on February 28, 1967,* Mr. Wolf testified that on December 1, 1964, the completed apartments were worth $475,000 to $480,000.00. On further cross-examination he admitted that the apartments were built and finished in April 1965 when he previously testified that $406,000.00 was a fair price for the property.

The Master and the Chancellor accepted the estimated market value of the property as of December 1, 1964, the date when the transaction should have been closed according to the contract, as testified to by Mr. Felix Treadway, a professional appraiser who was called to testify on behalf of the complainant Bubis. The Master, in analyzing the testimony, said, "The Master is of opinion that the valuation of Mr. Treadway is, to him, more acceptable, as Mr. Gibbs figures came into question on the cross-examination", and the Chancellor agreed with this conclusion.

In examining the testimony of these witnesses, we find that Mr. Treadway first looked at the property in question just before his deposition was scheduled to be taken on February 28, 1967. He stated that he had looked

at it shortly before that time but was seeking to appraise only the equities in the real estate, and so, on March 14, 1967, when he was called to testify in a deposition filed July 18, 1967, he stated that he had appraised it within the last two weeks and that he had not appraised it December 1, 1964, which was the date on which he was required to assess its value. He went on to testify that he looked at the plans and specifications and then took into account the cost of the land and several other factors mentioned by him in determining what he thought was the market value of the property as of December 1, 1964. His letter addressed to Mr. Lawrence E. Levine, Re: Alan Bubis, et al. vs. William G. Blackman (Exhibit 1 to his deposition), which letter is dated March 14, 1967, states:

"In accordance with your request I have appraised the property identified on the plans identified as Exhibit ''C'' to the original bill in the referenced case and submit herewith my opinion.

Based on my investigation, analysis and experience in the real estate appraisal profession, it is my opinion that the value of the subject property as of December 1, 1964 was:

FOUR HUNDRED SEVENTY-FIVE THOUSAND DOLLARS ($475,000)''

In his deposition he states that in estimating its value he, as appraiser, takes into account three things:

"One, cost estimate of value, which is similar to replacement cost. Two, economic value estimate, and in the case of property such as the subject property which is built to produce income, or which in turn relates to

what is the value of the ownership of the fee title, to enjoy the benefit of the income that might be earned by reason of that ownership. Third, is referred to as market data. Here I have referred to the market data estimate of value, and that's comparing the property being appraised with comparable or similar properties that have been sold and that are bona fide arm's length transactions; that probably would be best indicated by sales of other comparable properties."

He goes on to say that in this particular instance he had but one comparable sale of property and that, then, there was some difference in location and other matters and that apartment projects such as the one in question sell so seldom that it is hard to find comparable sales.

At one point Mr. Treadway was asked if he had been inside the apartments and he answered: "No, sir. I did my work from the plans, specifications, and exterior inspection.

He was asked if he assumed that they were built according to the plans and he answered affirmatively.

Mr. Homer B. Gibbs, Jr., who testified on behalf of the defendant, qualified as an expert appraiser of property such as that involved here. His deposition was taken on July 5, 1967 and he sought to appraise the market value of the property as of December 1, 1964. When asked how he arrived at his appraisal he stated that he did so from a survey of the property and from an inspection of it, after which inspection he computed the square footage of the building as well as the balconies, walks, storage area, paving, etc., and, after assigning a land value of $56,000.00, (which, incidentally was several thousand

dollars in excess of $39,000.00 cost), he came up with a total physical value of $414,500.00.

He discussed the income approach, taking into account the gross annual income, cost factors for operation, percentage from capitalization rate of 9% return on investment, and, by capitalizing on this factor, he figured the economic value at $398,888.00 which he rounded out to $400,000.00.

He also figured it from what is commonly described by appraisers as the market data approach which requires one to analyze comparable sales and he stated in this connection:

"To my knowledge, there were no sales, or certainly if any, very few sales as of December 1, 1964 of comparable properties." He, therefore, disregarded the market data approach.

After a rigid and extended cross-examination, we feel that Mr. Gibbs' estimate stood up remarkably well and his conclusions appear to us to be more plausible than those of Mr. Treadway. At one point, on cross-examination, in answer to a question about whether or not entrepreneur's profit should be added, he answered: "No sir, I am saying that the property as of December 1, 1964 is worth $400,000 to an informed buyer." He added that he did not think that an informed buyer would want to add an enterpreneur's profit to the $400,000.00 price.

He was then asked, if, in view of the fact that there was a $360,000.00 loan on the property, and taking into account a rule of thumb which it was said that insurance companies used in making loans, the value of the apartments would not be close to $500,000.00. He answered:

"I certainly do not. You brought up one point, I think should be emphasized, regarding the loan of $360,-000.00; as a further check as to the value of this property, we know from the information that has been furnished me from the closing statement that the mortgage payments on this loan are approximately $31,000 per year and the net income, according to my estimates, approximately $36,000 a year, so the cash flow what is left over after the mortgage payment is approximately five thousand dollars per year. I think the loan is very definitely—if you *ease* the value of the property to an informed buyer, because I think an informed buyer of an apartment house on December 1964 would want at least ten to twelve per cent return on his cash investment and if he had to assume this loan he would have to, according to my value, pay $40,000 and he would be getting about twelve per cent return, but at any rate, taking the five thousand dollars cash flow which is the net amount left over after all expenses and after all mortgage payments or after the first mortgage payment capitalizing this five thousand dollars cash flow indicates an equity value of about $50,000 at 12%, around $42,000.00 at 10%, which would indicate the value of the equity, if you add that to the loan amount which we know was in existence at the time of $360,000, it would indicate this, that the value would be around $400,000."

■ While we recognize the rule that a concurrent finding of fact by the Master and Chancellor is binding on the Appellate Courts if supported by any material evidence, this rule does not apply to questions of law or mixed questions of law and fact. As mentioned hereinabove, the Master pointed out in his report that the

question of estoppel is for the Court to decide and it is this question that we think is determinative of the issue as to the value of the property at the time of the breach. Gibson's Suits in Chancery (5th Ed.) 664 and notes. Vanhooser v. Cunningham, 24 Tenn.App. 480, 146 S.W.2d 840. However, we have discussed the testimony of the expert witnesses at some length to indicate that the conclusion reached by us does not seem to do violence to justice and equity as applied to the facts here involved.

Counsel for defendant places great stress upon the value placed on this property by the complainant Bubis and the agent Wolf in 1965 some months after December 1, 1964 at which time defendant Blackman declined to go through with the contract.

And it is insisted that complainants are individually estopped to change their testimony and to now insist that the property was worth $475,000.00, rather than the contract price of $406,000.00, which they each testified was a fair evaluation when seeking specific performance.

A number of cases are cited in support of the proposition of estoppel and several are cited by complainants in opposition thereto.

It is asserted by counsel for complainant that judicial estoppel does not apply to questions of opinion and that the testimony of complainant and of Wolf were merely expressions of opinion, and, therefore, not subject to judicial estoppel. Citing Black Diamond Collieries v. Deal, 150 Tenn. 474, 265 S.W. 985 and Stamper v. Venable, 117 Tenn. 557, 561, 97 S.W. 812.

Counsel for defendant cites State ex rel. Lawson v. Farmer, 189 Tenn. 276, 225 S.W.2d 60, wherein it was said:

"Under the doctrine of judicial estoppel, where one states on oath in former litigation, either in a pleading or in a deposition or on oral testimony, a given fact as true, he will not be permitted to deny that fact in subsequent litigation, though the parties may not be the same."

He also cites Hamilton v. Zimmerman, 37 Tenn. 39, where it is said that, although the law of judicial estoppel is applied where in former judicial proceeding one asserts facts under oath which he later undertakes to contradict, yet, *it is frequently applied* where no oath is involved, *to one who undertakes to maintain inconsistent positions in a judicial proceeding.* In the opinion it is stated:

"The principle underlying these decisions runs throughout the administration of justice, and is that a litigant who has deliberately taken a position will not as a matter of law be allowed to advantage himself by taking an inconsistent one either in the same or in another suit."

There are numerous other decisions on the subject, however, we think it is sufficient to say that a party cannot be allowed to solemnly take a position in the course of litigation which he thinks is to his advantage, and, then, change that position to another and contrary one when he deems it to his advantage to do so.

We are impressed that both Mr. Bubis and Mr. Wolf, when they were seeking specific performance, insisted that $406,000.00 which Mr. Bubis proposed in the contract to pay was a fair and reasonable price for the property in question. But, when this Court refused specific performance and remanded the case for the

determination of damages, they, for the first time, took the position that the property was worth very much more than $406,000.00 and that $475,000.00, as estimated by the appraised Treadway, was the fair market value of the property as of December 1, 1964.

We think that these parties must be repelled in their attempt to thus change their position.

This leaves the matter of a division of the rents which, under the contract, they were to divide equally and, since the rents were shown to be $17,015.00, half of which was found to be $8,507.50, complainant is clearly entitled to recover this amount.

As to the real estate commission of the agent Wolf, we are persuaded to believe that, in spite of the dual position he assumed in this case, part of which is contrary to the rights and interests of his principal, nevertheless, this question was determined and settled in the foregoing findings and opinion of this Court when we concurred in the findings of fact of the Chancellor and affirmed his decree except as to specific performance.

It results that the judgment of the Chancellor is modified to the extent of disallowing that portion of the award of damages based upon an alleged market value in excess of $406,000.00 as of December 1, 1964.

As thus modified the decree of the Chancellor is affirmed with costs.

Modified and affirmed.

Puryear and Todd, JJ., concur.