**Jon Saxton NASH–PUTNAM and Sandra Elaine Nash–Putnam, Plaintiffs– Appellees,**

v.

**Lou Anne McCLOUD, Defendant– Appellant.**

Supreme Court of Tennessee, at Nashville.

April 22, 1996.

Robert D. Tuke, Tuke, Yopp & Sweeney, Nashville, for Petitioners–Appellees.

Gregory D. Smith, Willis & Knight, Nashville, for Defendant–Appellant.

## OPINION

REID, Justice.

This case presents an appeal from the decision of the Court of Appeals affirming a judgment terminating the parental rights of the respondent-mother and decreeing the adoption of the child by the petitioner-foster parents. The record supports that judgment.

Debra McCloud was born on December 22, 1988. Two months later, in February 1989, she became a ward of the state, subject to the management of its Department of Human Services (DHS) and the pronouncements of its courts. Since the State became her *parens patriae*, Debra has been the victim of inconsistent counsel provided by State-employed experts, inconsistent positions by DHS with regard to her custody, and conflicting decisions by a juvenile court referee, a special judge of the juvenile court, the circuit court on two hearings, and two appeals to the Court of Appeals. In addition, she was the victim in two criminal court proceedings. This Court, seven years later, finally adjudges her legal fate.

The precipitating circumstances were acts of abuse and neglect by her parents. Evidence of physical abuse, a scratch and some bruises, first appeared on the day that Debra's mother, the appellant Lou Anne McCloud, returned to work. Debra was six weeks old. Her father, Kenneth McCloud, who was alone with the child before Ms. McCloud arrived home, explained that he had dropped the baby. During the next week, Ms. McCloud observed additional bruises, a swollen lip, a black eye, and abrasions in the child's vaginal area. The father avowed that all these conditions were the result of accidents which occurred while he was keeping the child. Ms. McCloud's moth-

er suggested to her daughter that the injuries were not the results of accidents. On February 16, 1989, Debra's babysitter called Ms. McCloud and told her that Debra had a severe laceration inside her mouth and a high fever. Debra was taken to a hospital, where an examination revealed bruises and lacerations on her head, face, and stomach, vaginal bleeding and a bite mark on the child's breast.

Questioning by police officers and DHS personnel produced an admission by the father that he had struck the child because she would not be quiet. The father was arrested at the hospital, Ms. McCloud was arrested later. The father was charged with aggravated assault and assault and battery, and Ms. McCloud was charged with aggravated assault for failing to protect her child from abuse by the father.

Upon petition filed on February 16, 1989 in the juvenile court by DHS asking that the child be declared dependent and neglected,[1] temporary custody was awarded to DHS, and on February 21, 1989, the child was placed with Mr. and Mrs. Nash–Putnam, the appellees, as foster parents.

Debra was the first child kept by the Nash–Putnams pursuant to an agreement with DHS that children would not be placed with them for extended periods of time and they would not be permitted to adopt a child placed with them except with the approval of DHS. However, by November 1989, the Nash–Putnams had commenced efforts to adopt Debra, which included discussions with Ms. McCloud and the DHS case worker. The relationship between the foster parents and DHS soon became strained because DHS resisted the Nash–Putnams' efforts to have the mother's parental rights terminated.

The goal of the original foster care plan prepared by DHS was that Debra and her mother, who had separated from the father, be reunited by December 1989. As a part of that plan, Ms. McCloud began attending classes and counseling sessions designed to improve her parenting skills and her ability to tolerate stress. She visited with Debra to the extent allowed by the custody order.

In December 1989, another child was born to the McClouds; in June 1990, they divorced; in July 1990, Ms. McCloud was convicted on three counts of aggravated assault and received a four year sentence, all of which, except for 45 days, was suspended; and the father was ordered to serve one year of an eight-year sentence on six convictions of aggravated assault and one conviction of assault and battery. Visitation between Debra and her mother continued while Ms. McCloud was incarcerated.

DHS reports prepared in August and October 1990, supported the return of custody to Ms. McCloud by September 1991; this plan was approved by the juvenile court and subsequently ratified by a DHS multi-disciplinary team. During this time, the Nash–

1. Tenn.Code Ann. 37–1–102(b)(10) (Supp.1995) provides: "Dependent and neglected child" means a child:

(A) Who is without a parent, guardian or legal custodian;

(B) Whose parent, guardian or person with whom the child lives, by reason of cruelty, mental incapacity, immorality or depravity is unfit to properly care for such child;

(C) Who is under unlawful or improper care, supervision, custody or restraint by any person, corporation, agency, association, institution, society or other organization or who is unlawfully kept out of school;

(D) Whose parent, guardian or custodian neglects or refuses to provide necessary medical, surgical, institutional or hospital care for such child;

(E) Who, because of lack of proper supervision, is found in any place the existence of which is in violation of law;

(F) Who is in such condition of want or suffering or is under such improper guardianship or control as to injure or endanger the morals or health of himself or others;

(G) Who is suffering from or has sustained a wound, injury, disability, or physical or mental condition caused by brutality, abuse or neglect;

(H) Who has been in the care and control of an agency or person who is not related to such child by blood or marriage for a continuous period of eighteen (18) months or longer in the absence of a court order and such person or agency has not initiated judicial proceedings seeking either legal custody or adoption of the child; or

(I) Who is or has been allowed, encouraged or permitted to engage in prostitution or obscene or pornographic photographing, filming, posing, or similar activity and whose parent, guardian or other custodian neglects or refuses to protect such child from further such activity.

Putnams strongly criticized DHS's foster care program on a local television show. They also disclosed to the DHS case worker that they planned to intervene in the case and that "Missy," the name they had given Debra, "will be practically grown by the time this matter is settled." They referred to plans to appear on national television shows on which DHS "would look less foolish if they were planning to terminate" Ms. McCloud's parental rights.

On April 9, 1991, Ms. McCloud moved the juvenile court for a hearing on the issue of custody. The Nash–Putnams, in a motion to intervene, petitioned the juvenile court to terminate Ms. McCloud's visits with the child. At the hearing, a juvenile court referee increased rather than terminated the mother's visitation privileges. On May 6, 1991, the guardian ad litem appealed the decision to the juvenile court judge, who recused himself and appointed a special judge. Eight months later, on January 6, 1992, the special judge concluded the hearing and rendered a decision.

On the appeal to the juvenile judge, heard by the special judge, DHS reversed its two-and-one-half-year's support of Ms. McCloud's right to retain her parental rights and, instead, supported the foster parents' position that Ms. McCloud's visits should be terminated. DHS apparently relied upon the views of the third clinical psychologist, who was retained to evaluate Debra's condition and circumstances after DHS had discharged two clinical psychologists previously retained for that purpose. However, the special judge denied the request that the mother's visitations be terminated and set July 8, 1992 as the date for a further hearing on the issue of custody.[2] This judgment determining visitation was appealed to the circuit court, which accepted jurisdiction. During the hearing of the appeal in the circuit court, the Nash–Putnams filed, as an original suit in the circuit court, a petition for the adoption of Debra.

The decision of the circuit court on the appeal from juvenile court was appealed to the Court of Appeals. Those proceedings were described by Judge Koch, who wrote for the Court of Appeals, as follows:

"The special juvenile judge filed an order on January 6, 1992 that was highly critical of the department's handling of the case. The special judge found: (1) that the department had failed to make reasonable efforts to reunite Ms. McCloud and her daughter; (2) that the department had betrayed Ms. McCloud by leading her to believe that her daughter would be returned to her if she followed through with the foster care plan; (3) that Ms. McCloud had remedied the conditions that had required the removal of her daughter in February 1989; and (4) that it was in the child's best interests to increase visitation in an effort to reunite Ms. McCloud and her daughter on or before July 8, 1992. The special judge also set a hearing on July 8, 1992 'to determine if custody will be transferred from DHS to Lou Ann McCloud, and the visitation rights, if any, of the foster parents.'

"The special juvenile judge was never able to conduct the July 8, 1992 hearing because the Nash–Putnams pursued an appeal to the circuit court. Notwithstanding Ms. McCloud's objections to the prematurity of the appeal and the court's jurisdiction, the circuit court decided to entertain the appeal, to stay the juvenile court proceedings, and to set a hearing for May 21, 1992.

"On the day of the hearing, the Nash–Putnams filed a petition in the circuit court to terminate Ms. McCloud's parental rights and to adopt the child. Rather than supporting the Nash–Putnams as it had in the proceeding before the special juvenile judge, the department changed its position again and recommended that the child be returned to Ms. McCloud in a graduated manner.

"Following six days of hearings, the circuit court entered an order on June 18, 1992, finding (1) that the child was dependent and neglected; (2) that the child was a special needs child; (3) that the child had bonded to the Nash–Putnams; (4) that the Nash–Put-

2. The juvenile court at that hearing terminated the father's parental rights, from which there was no appeal.

nams had more than sufficiently met the child's needs during the three years she had been in their care; and (5) that visitation and placement with Ms. McCloud would not be in the child's best interests. Accordingly, the circuit court ordered the immediate termination of Ms. McCloud's visitation rights and remanded the case to the juvenile court with directions to the department 'to proceed with proper petitions for termination of parental rights of the mother allowing adoption proceedings to be initiated by the foster parents.' Ms. McCloud and the department have appealed from this order.

"This case should never have reached this court in its present posture. It highlights the shortcomings in the present foster care and adoption procedures whose purpose should be to mitigate the damage dysfunctional families inflict on children. These cases deal with delicate, far reaching issues that are best decided quickly and finally. Regrettably, the present statutory scheme for dealing with these issues invites delay, and every day that passes makes a final decision more difficult and more painful to all involved.

"There is no shortage of victims in this case. To be sure, Debra McCloud is the victim of serious physical abuse. While her physical wounds have healed, she still suffers from psychological wounds received at her father's hands when she was two months old. But Ms. McCloud and the Nash–Putnams are victims as well. Like the child, they have been victimized by vacillating department personnel too preoccupied with departmental policies and procedures, conflicting expert opinions, statutes creating hazy jurisdictional boundaries that permit judge shopping and delay, and discordant judicial attitudes concerning the best interests and rights of all the parties.

"The department cannot be faulted for removing Debra from the McCloud home and placing her in a foster home. Certainly the Nash–Putnams cannot be faulted for taking the child in and for supporting and nurturing her while she has been in their care. Nor can they be faulted for their inevitable emotional attachment to the child. There is, however, no justification for the department's clumsy delay in bringing about a prompt and conclusive resolution of the child's fate or for the circuit court's assumption of jurisdiction in the clear absence of statutory authority."

Finding the court compelled by statutes governing the jurisdiction of the juvenile and circuit courts, the Court of Appeals held that, because the circuit court did not have jurisdiction to hear an appeal from the juvenile court's order denying the motion to terminate Ms. McCloud's visits with the child, which was not the only issue before the juvenile court, the circuit court's order was void. However, the Court of Appeals recognized that the circuit court, pursuant to its plenary jurisdiction over the petition for adoption, would consider all matters previously considered by it and the juvenile court, and therefore, remanded the case to the circuit court. The Court of Appeals held that the circuit court should decide two issues, whether the mother's parental rights should be terminated and whether adoption should be ordered.

The petition to adopt was heard in the circuit court on November 2, 1993. The entire record of the prior hearing in that court was made an exhibit and considered by the court. In addition, the court heard testimony: that the child had formed a bond with the foster parents and breaking the bond would be extremely traumatic to the child; that the foster parents had been excellent parents to the child, although the foster father had not seen his own daughter from a previous marriage in two years and was not current in making child support payments; and, from two clinical psychologists, that the child's best interests would be served by her remaining with the foster parents. On the other hand, there was testimony: that the mother had made extensive progress in the training designed to make her an appropriate parent; by a DHS social worker recommending the return of the child to the mother; that Ms. McCloud had been a good parent to her second daughter; that after the juvenile court increased visitation, the child and mother showed genuine affection for each other; and, from a counselor with a master's degree in psychology, the recommendation that the child be returned to the mother.

The court terminated the mother's parental rights and allowed the foster parents to adopt the child. The court found that the proof established the following conditions and circumstances set forth in Tenn.Code Ann. § 37–1–147(d)(1)(A), (B), (C); (2); and (3) (1991),[3] which are, as follows:

1) The child has been removed from the custody of the parent by the court for at least one (1) year and the court finds that:

(A) The conditions which led to the removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's return to the care of the parent(s) still persists;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be returned to the parent in the near future; and

(C) The continuation of the legal parent and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home.

2) The parent has been found to have committed severe child abuse against the child;

3) The parent has been sentenced to more than two (2) years' imprisonment for conduct which has been or is found to be severe child abuse. . . .

The Court of Appeals affirmed the termination of Ms. McCloud's parental rights.

### Standard of Review

The standards of review applicable to this case are well stated in *Aaron v. Aaron,* 909 S.W.2d 408, 410 (Tenn.1995),

In cases such as the one under submission, where the cause was tried without a jury, we note that while concurrent findings of fact are binding on the reviewing court if supported by any material evidence, such a rule does not apply to questions of law or mixed questions of law and fact. *Bubis v. Blackman,* 435 S.W.2d 492, 498 (Tenn.Ct.App.1968). Mixed questions of law and fact are subject to review. *Murdock Acceptance Corp. v. Jones,* [50

Tenn.App. 431,] 362 S.W.2d 266, 268 (Tenn. Ct.App.1961). We find that a presumption of correctness does not attach, but as with questions of law, this Court has great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal.

*See also* Tenn.Code Ann. §§ 27–1–113, 27–3–103 (1980); Tenn.R.App.P. 13.

### Analysis

Even though *In re Adoption of Female Child,* 896 S.W.2d 546 (Tenn.1995) and *Petrosky v. Keene,* 898 S.W.2d 726 (Tenn.1995), had not been decided when the Court of Appeals rendered its decision in this case, the issues presented by this case are determined by the principles set forth in those cases.

In three recent decisions, this Court examined the constitutional rights of parents regarding their children. These cases recognized that,

Tennessee courts have historically held that, "a parent is entitled to the custody, companionship, and care of the child, and should not be deprived thereof except by due process of law. It is a natural right, but not an inalienable one. The parents are trusted with the custody of the child upon the idea that under the instincts of parental devotion it is best for the child."

*In re Adoption of Female Child,* 896 S.W.2d 546, 547 (Tenn.1995) (quoting *State ex rel. Bethell v. Kilvington,* 100 Tenn. 227, 236, 45 S.W. 433, 435 (1898)); *see also Hawk v. Hawk,* 855 S.W.2d 573, 577 (Tenn.1993).

Parents . . . have a fundamental liberty interest in the care and custody of their children under both the United States and Tennessee Constitutions. *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Hawk v. Hawk,* 855 S.W.2d 573 (Tenn.1993). However, this right is not absolute and the State may interfere with parental rights if there is a compelling State interest. *Santosky v.*

---

**3.** This code section was amended, effective January 1, 1996. *See* Tenn.Code Ann. §§ 37–1–147 and 36–1–113 (Supp.1995).

*Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Hawk v. Hawk,* 855 S.W.2d at 579.

*Nale v. Robertson,* 871 S.W.2d 674, 678 (Tenn.1994).

This Court held in *In re Adoption of Female Child,* 896 S.W.2d 546, 547–48 (Tenn. 1995), that "in a contest between a parent and a non-parent, a parent cannot be deprived of the custody of a child unless there has been a finding, after notice required by due process, of substantial harm to the child. Only then may a court engage in a general 'best interest of the child' evaluation in making a determination of custody."

*Petrosky v. Keene,* 898 S.W.2d 726, 728 (Tenn.1995).

■ The first issue is whether the pleadings and proof in the case before the Court support a finding of substantial harm to the child, that would justify the termination of Ms. McCloud's parental rights. The petition filed by DHS, and considered by the trial court in the adoption proceedings, charge that Debra was a "dependent and neglected" child as defined in Tenn.Code Ann. § 37–1–102(b) and relied specifically upon subsection (G), which includes in that definition a child "[w]ho is suffering from or has sustained a wound, injury, disability, or physical or mental condition caused by brutality, abuse or neglect." That section describes a substantial harm, and the petition was adequate notice.

The record in this case supports the concurrent findings by the trial court and the Court of Appeals that Ms. McCloud was responsible, along with her husband, for the injuries and resulting harm to the child. There was evidence that she was aware that the abuse was occurring prior to the date she took the child to the hospital, that she failed to protect the child from the abuse, and that

the conduct was likely to cause great bodily harm or death.

The conclusion is that the constitutional requirements of notice and proof of substantial harm have been met, thus allowing the Court to intrude upon the mother's parental rights.

■ The next issue is whether the proof is sufficient to support the termination of the mother's parental rights pursuant to Tenn. Code Ann. § 37–1–147. That section provides that parental rights may be terminated if the court finds by clear and convincing evidence that termination is in the child's best interests and also finds the existence of one or more of several conditions, including:

(2) The parent has been found to have committed severe child abuse against the child;

(3) The parent has been sentenced to more than two (2) years' imprisonment for conduct which has been or is found to be severe child abuse.

The Court of Appeals found:

After reviewing the record in this case we think the evidence is clear and convincing (1) that Ms. McCloud was aware that the abuse was occurring, (2) that she failed to protect the child, (3) that the conduct was likely to cause great bodily harm or death and (4) that the abuse caused the severe psychological problems described in Tenn.Code Ann. § 37–1–102(b)(19)(B).[4]

. . . . .

We consider the following facts to be established by clear and convincing proof. First, the child suffered severe trauma as a result of the abuse, the psychological effects of which have been deep and persistent. Second, the emotional support allowing the child to cope with the lasting psychological effects of the abuse has been supplied by the foster parents. Third, as a result the child has formed a bond with the

---

**4.** Tenn.Code Ann. § 37–1–102(b)(19)(B) (Supp. 1995) states:

(19) "Severe child abuse" means:

. . . . .

(B) Specific brutality, abuse or neglect towards a child which in the opinion of qualified experts has caused or will reasonably be ex-

pected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or retardation, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct.

foster parents as great as the bond between a child and its natural parents. Fourth, breaking that bond after five and a half years would be extremely traumatic to the child. In addition, the record does not support a finding that Ms. McCloud would be able to supply the required emotional support for the child to successfully cope with the loss. For these reasons we think the trial judge was correct in finding that terminating Ms. McCloud's parental rights was in the child's best interests.

The record supports the finding by the Court of Appeals that Ms. McCloud committed severe child abuse under Section 37–1–147(d)(2), and that terminating the mother's parental rights was in the child's best interest. Ms. McCloud's argument that the statute applies only to one who "commits" the abuse is untenable. Allowing a child to be abused is egregious abuse.

■ The record also supports the Court of Appeals' finding that Ms. McCloud "has been sentenced to more than two (2) years' imprisonment for conduct which has been or is found to be severe child abuse." Tenn.Code Ann. § 37–1–147(d)(3). Any doubt regarding the meaning of that statute was removed by the 1996 amendment. The statute now reads:

> The parent or guardian has been sentenced to more than two (2) years imprisonment for conduct against the child who is the subject of the petition, ... which is found by the court hearing the petition to be severe child abuse.... Unless otherwise stated, for purposes of this subdivision, "sentenced" shall not be construed to mean that the parent or guardian must have actually served more than two (2) years in confinement, but shall only be construed to mean that the court had imposed a sentence of two (2) or more years upon the parent or guardian.

Tenn.Code Ann. § 36–1–113(g)(5) (Supp. 1995). With or without the amendment, the focus is on the seriousness of the offense as determined by the severity of the sentence, rather than the time actually incarcerated. The conclusion on this issue, therefore, is that the record supports the decision terminating Ms. McCloud's parental rights.

Ms. McCloud also asserts on this appeal that the court erred in granting the adoption. That contention is based solely on the claim that the court erred in terminating her parental rights. Ms. McCloud did not assert at the trial and does not assert in this Court that the Nash–Putnams are not suitable persons to adopt Debra. Since the issue regarding the termination of parental rights has been resolved against her, the issue of adoption must be resolved against her also.

The judgment of the Court of Appeals is affirmed, and the case is remanded to the circuit court.

Costs are taxed against the appellant Lou Anne McCloud.

ANDERSON, C.J., and DROWOTA, BIRCH, and WHITE, JJ., concur.