# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs May 13, 2010

## IN RE:  Nathan T.[1]

### Appeal from the Juvenile Court for Dickson County
### No. 09-09-064-CC     A. Andrew Jackson, Judge

---

### No. M2010-00082-COA-R3-PT - Filed June 7, 2010

---

Mother appeals the termination of parental rights to her child, asserting that the findings of the Juvenile Court that she abandoned the child by failing to provide a suitable home, that the conditions which led to the removal of the child persisted, and that termination of her rights were in the best interest of the child are unsupported by clear and convincing evidence. We affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., and ANDY D. BENNETT, JJ., joined.

Lindsay C. Barrett, Dickson, Tennessee, for the appellant, Megan T.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, and Joshua Davis Baker, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

## OPINION

This appeal involves the termination of parental rights with regard to a child, Nathan T., who came into protective custody of the Department of Children's Services ("DCS") on November 7, 2006. DCS initiated a proceeding to secure temporary custody of Nathan following receipt of a referral that he had been left by his mother, Megan T., ("Mother") with two elderly women in a house with no heat and where the women were using drugs; Mother

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing their last name.

could not be found.[2]  By order entered January 24, 2007, Nathan was adjudicated dependent and neglected and custody awarded to DCS; he was subsequently placed in a foster home, where he has remained throughout these proceedings.

On September 30, 2009, DCS filed a petition seeking to terminate Mother's parental rights on the grounds of abandonment by failure to provide a suitable home (Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii)) and persistence of conditions (Tenn. Code Ann. §§ 36-1-113(g)(3)).[3]  DCS also contended that termination of Mother's parental rights was in the best interest of Nathan.  Mother duly answered the petition, denying that grounds for termination of her parental rights existed and that termination was in Nathan's best interest.

A hearing on the petition was held on November 9th and 16th, following which the court entered an order terminating Mother's parental rights on the grounds alleged in the petition.[4]  Mother appeals, raising the following issues:

> 1.  Whether the evidence was clear and convincing that Appellant abandoned the minor child by failing to provide a suitable home.
> 2.  Whether the evidence was clear and convincing that the conditions which led to the child's removal still persist.
> 3.  Whether the evidence was clear and convincing that termination of the Appellant's parental rights is in the child's best interest.

## I. STANDARD OF REVIEW

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996).  Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer,*

---

[2]  Nathan T. was almost two years old at the time he was placed into DCS custody.

[3]  Nathan T.'s father surrendered his parental rights on August 20, 2007, and was not a party to the proceedings at issue in this appeal.

[4]  Although the court's order recited that Mother had abandoned Nathan by engaging in conduct that exhibited a wanton disregard for the welfare of Nathan, the trial court based its order terminating her rights in part on a finding of abandonment by failing to provide a suitable home as specified at Tenn. Code Ann. § 36-1-102(1)(A)(ii).  The reference to wanton disregard for Nathan's welfare was clearly a misnomer as the balance of the opinion discusses Mother's efforts to secure and provide housing.  We base our analysis on Tenn. Code Ann. § 36-1-113(g)(1).

455 U.S. 745 (1982)). Terminating a person's parental rights "has the legal effect of reducing the parent to the role of a complete stranger." *In re W.B., IV.*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005). Pursuant to Tenn. Code Ann. § 36-1-113(1)(1), "[a]n order terminating parental rights shall have the effect of severing forever all legal rights and obligations of the parent or guardian of the child against whom the order of termination is entered and of the child who is the subject of the petition to that parent or guardian."

Our termination statues identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, 2005 WL 1021618, at *7 (citing Tenn. Code Ann. § 36-1-113(g)). To support the termination of parental rights, petitioners must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine,* 79 S.W.3d 539, 546 (Tenn. 2002); Tenn. Code Ann. § 36-1-113(c).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769; *Matter of M.W.A., Jr.*, 980 S.W.29 620, 622 (Tenn. Ct. App. 1998). Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.*

In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d at 654. As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

## II. DISCUSSION

A. Abandonment by failing to provide a suitable home

Tenn. Code Ann. § 36-1-113(g)(1) provides that abandonment, as defined in Tenn. Code Ann. § 36-1-102, is a ground for termination of parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(ii) defines "abandonment" as respects this case as follows:

(ii) The child has been removed from the home of the parent(s) or guardian(s) as a result of a petition being filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department . . . that the juvenile court found . . . that the department . . . made reasonable efforts to prevent removal of the child . . . and for a period of four months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date...

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

Although the instant petition was filed in September 2009, the events leading to its filing began in March 2009, following the dismissal of an earlier petition, also filed by DCS, alleging that Mother had abandoned Nathan. The instant petition alleged that, in the six months preceding its filing, and despite DCS' efforts to assist her, Mother had not made reasonable efforts to provide a suitable home; that she had not found employment and could not provide financially for Nathan; that she had withdrawn from a program training her to be a dental assistant; that she had been involved in an altercation with the paramour with whom she had been living; and that Mother's situation had not been stable since Nathan was placed in DCS custody and showed no prospects of improving to the point where she could regain custody.

The trial court found that DCS made reasonable efforts and provided services to assist Mother in establishing a home and in developing and maintaining stability in her life, a finding challenged by Mother. While the record of this case does not contain the record of the prior termination proceeding or a permanency plan in effect at any time since Nathan was placed in DCS custody,[5] at the hearing on the instant petition, Ms. Shelby McClurkan, DCS supervisor with responsibility for the case since October 2007, testified that, after the March

---

[5] There are references in the DCS case record reports which are a part of the record to a permanency plan and to a July 1, 2009, hearing to ratify the permanency plan.

9, 2009 hearing on the earlier petition, a team meeting was held with Mother present and the following transpired:

> At that time we were really looking for reunification. Between the termination date and March 9th and it not being granted [sic] until the 23rd, she'd had a few bumps in the road. But she'd actually had some plans, some next steps, and we were really trying to work towards reunification, making sure some supports were in place. She also understood there was a dual goal in the plan in the event that this plan was not able to be worked and fulfilled, and it was set for six months. So she knew that we were going to be looking at this very closely, and at the end of the six months, that we would move forward with our other goal of adoption.. . . At the staffing on the 23rd, she had her family friend Ms. Julie Carter there, and she had planned on moving into her home at that time. She was still working with her externship through Kaplan, so she had some plans in place and were still moving along.

Ms. McClurken also testified to her personal involvement in DCS' efforts and the monitoring and assessment of Mother's efforts, including providing transportation for Mother and Nathan to a counseling session and observing their visitation after the session. Jennifer Rewczuc, the DCS case manager assigned on May 11, 2009, testified at length as to her efforts to assist Mother in securing employment, setting up parenting classes and facilitating visits with Nathan. The DCS case record reports show, amongst other things, continuing efforts on the part of DCS to assist Mother in implementing parenting skills.

Although Mother contends that the court did not specify the efforts of DCS that the court deemed reasonable,[6] the order terminating her parental rights states the following:

> Since March, 2009, DCS has worked diligently with [Mother] to assist her in developing and maintaining stability. Because of the concern about the domestic violence between [Mother] and her boyfriend with whom she was living while she was in Nashville, a psychological intake was completed. The recommendations from that intake included parenting education, which DCS set up through the provider Center for Personal Transformation and Healing. DCS also worked to assist [Mother] in finding a job. She was asked to submit

___

[6] Inasmuch as DCS did not seek to terminate Mother's parental rights on the ground of noncompliance with the permanency plan, we review DCS' efforts to assist her in the context of those areas which served as the basis of the court's ruling, i.e., abandonment by failure to provide a suitable home and persistence of conditions.

the name and telephone number of the person or company with whom she interviewed. She was asked to provide DCS with documentation of where she obtains her money and how she spends it in order to assist with her budgeting. Sessions with the child's therapist were set up for both [Mother] and the child to assist in bonding between the two of them. DCS stopped those sessions because the foster mother reported that the child was having behavioral issues. There is also a concern because on a recent unannounced home visit, the boyfriend with whom [Mother] was involved in the domestic altercation was at [Mother's] present home in Hickman County.

Our review of the record supports the court's finding that DCS expended reasonable efforts to assist Mother.

In response to the court's finding, Mother points to evidence in the record establishing her compliance with the requirements of the permanency plan including, remaining drug free, becoming employed without DCS assistance, completing parenting classes, attending joint counseling sessions and visiting regularly with Nathan. These facts, many of which were acknowledged by DCS in the case record reports, while commendable, are not dispositive of the issue presented - whether she had failed to establish a suitable home.

The record shows that, a few days after the March 9, 2009 hearing on the previous petition, Mother was involved in an altercation with her boyfriend at the apartment in Nashville they shared. Mother left the home and moved in with a family friend in Bon Aqua, located in Hickman County. She also took a "leave of absence" from an externship which was part of a training program in which she was enrolled at Kaplan University. Mother remained in the family friend's home until approximately two weeks before the November 9 hearing, when she left to stay with either her grandmother or mother. At the hearing Mother testified that she did not "technically" move out of the home (which she had represented to DCS was where she would be living if Nathan were returned to her) but left because she worked late and woke up the children in the home when she came in.[7] The owner of the home testified that Mother stayed at the home until about four weeks prior to the hearing, at which point she left, taking most of her things; that Mother had told her that she was getting her own apartment; and that, the weekend prior to the hearing, Mother returned, saying that she was unable to get the apartment. There was also testimony at the hearing relative to concerns DCS had about the home in which Mother resided. Particularly, there was testimony that, during a surprise visit by Ms. McClurkan, the man with whom Mother had previously lived had been seen at the home along with several other men and that the owner of the home used drugs in the home.

---

[7] The owner of the home had three children who resided with her.

Specifically, with respect to Mother's efforts to find a suitable home, the trial court noted:

> [Mother] has made no reasonable efforts to provide a suitable home. The Court has concerns with the home [Mother] has maintained and where she is living. It is clear that [Mother] moved out 1-1/2 to 4 weeks prior to November 9th [the date of the hearing] from where she had been living. . . .[Mother's] failure to make even minimal efforts to improve her home or personal condition demonstrates a lack of concern for the child to such a degree that it appears unlikely that she will be able to provide a suitable home for the child at an early date.

The evidence of record does not preponderate against the findings of the trial court and those facts clearly and convincingly establish that Mother failed to establish a suitable home. The record shows that Mother had six months within which to establish a home that would be acceptable to DCS and the court but, more importantly, which would facilitate her relationship with Nathan and his growth and development. Mother was aware of DCS' concerns about the home in which she was living and her efforts were largely directed toward securing a place to live for herself. The record shows that Mother made an unsuccessful attempt to secure an apartment and that residing with her mother (Nathan's grandmother) was not an option. While Mother's living situation at the time of the hearing may have responded to her individual needs, the law requires that the home and home environment be suitable to raise the child who has been previously removed. We agree with the trial court that Mother's personal living situation was not suitable in light of the history and the causes of Nathan's removal.

### B. Persistence of conditions

Tenn. Code Ann. § 36-1-113(g)(3) sets forth, in pertinent part, the following ground for terminating a parent's parental rights:

> (A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

A termination proceeding based on the persistence of conditions ground requires a finding by clear and convincing evidence of all three statutory factors. *In re Valentine*, 79 S.W.3d at 549.

The trial court found that each factor was shown by clear and convincing evidence. Mother contends that the court erroneously characterized her relationship with her former boyfriend as abusive or destructive and that the relationship was not evidence of persistence of conditions. Mother further contends that she felt discouraged by DCS in her attempts to establish more contact with Nathan and to strengthen the bond between them.

While Mother's relationship with her former boyfriend was noted in the court's decision as well as in the DCS reports, it is apparent, viewing the record as a whole, that the relationship was not the only or, indeed, the predominant factor in the court's consideration of persistence of conditions. The record shows that many areas of Mother's life deteriorated following the domestic altercation in the days after the March 2009 hearing and that the conditions of instability which led to the initial removal of Nathan from Mother's custody, persisted through the date of the hearing. As noted by the trial court:

> DCS removed the child from the home [in November 2006] because of [Mother's] instability. . . . At the time of removal [Mother] was not making good choices with regard to her son.

> The conditions that led to the removal still persist: [Mother] continues to make poor choices leading to her present circumstances. [Mother] was just one (1) month away from completing a program which would have given her an opportunity to be able to provide financially for her son. She was about to complete a dental assistant program, but she dropped out and moved from Nashville, Tennessee where she was working on the degree to Hickman County, Tennessee after a domestic altercation with her then boyfriend.

> . . . in March of 2009 a hearing was held on a petition to terminate [Mother's] parental rights filed by the Department of Children's Services. The Juvenile Court dismissed that Petition because [Mother] appeared to be making progress as she was enrolled in the dental assistant program, she had a home in Nashville, she had passed drug screens and the Court could not conclude that [Mother] wilfully abandoned her child during the four month [sic]

-8-

preceding the filing of the Petition. [Mother] was given another chance. In April of 2009 [Mother] left her home in Nashville, Tennessee because of the domestic altercation between her and her then boyfriend . . . with whom she had been living. Both she and the boyfriend were charged. They subsequently dropped the charges against each other. She also quit the dental assistant program and moved in with a friend in Hickman County, Tennessee after this altercation.

In addition, there was proof that Mother was arrested on charges other than that involving her former boyfriend since the March 2009 hearing: in August for assault and vandalism following a fight with a new boyfriend in the parking lot of a bar; in September for public intoxication; and for domestic assault on her brother shortly before the November hearing. There was also proof that Mother's former boyfriend took her fishing one day in April and was at the home in which she was residing when DCS made a home visit in September.

We are not unmindful of Mother's contention that she was discouraged by DCS in her efforts to reunite with Nathan, specifically, that her unsupervised visits with him were stopped by DCS and that she was barred from participating in his counseling sessions. The concerns of Mother were expressed at the hearing and there was testimony addressing the basis of the decisions of which she complained  We have reviewed the record and do not find evidentiary support for the contention that DCS discouraged her from developing a relationship with Nathan. To the contrary, the testimony of DCS personnel and the case record reports show that DCS was supportive of Mother and that the decisions which were made relative to visitation and Mother's attendance at Nathan's counseling sessions were made based upon concerns expressed by the counselor and in the best interest of Nathan.

Upon a review of the record, we find that the evidence preponderates in favor of the trial court's factual findings regarding the conditions which led to the removal of Mother's child and that those findings clearly and convincingly support the trial court's finding that the conditions persisted at trial. The conditions cited by the court were the result of decisions made by Mother which moved her away from the stability that Nathan needed and which was the objective of DCS and the court; the conditions cited support the court's finding that continuation of the relationship would reduce the chances of Nathan being placed in a safe and stable home.

C. Best interest of the child

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is the best interest of the child for the parent's

rights to be terminated, again using the clear and convincing evidence standard. The legislature has set out a list of factors for the courts to follow in determining the child's best interest at Tenn. Code Ann. § 36-1-113(i). The list of factors set forth in the statute is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest. *See In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *State of Tennessee Dep't of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E206-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).

The trial court cited three bases in determining that termination of Mother's parental rights was in the best interest of Nathan:

> . . . [Mother] has not made changes in her conduct or circumstances that would make it safe for the child to go home. She is still unable to show that she is able to provide a safe and stable home for her child.
> . . .changing caregivers at this stage of his life will have a detrimental effect on him. The child's therapist has said that moving the child from his present foster/pre-adoptive home would cause him life long problems.
> . . . the child has established a strong bond with his foster parents, who wish to adopt him. [Nathan] was placed with these foster parents . . . in November 2006 when he was almost two (2) years old and has remained there ever since.

The findings of the court are supported by the evidence and are proper considerations in applying Tenn. Code Ann. § 36-1-113(i). The evidence does not preponderate against the trial court's finding that termination of Mother's parental rights was in Nathan's best interest.

## III. CONCLUSION

For the reasons set forth above, the order of the Juvenile Court is AFFIRMED.

Costs of this appeal are assessed to Mother.

_____
RICHARD H. DINKINS, JUDGE