IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 16, 2010 Session

## In re: Casen J.

**Appeal from the Juvenile Court for Coffee County**
**No. 08J-0853      Timothy R. Brock, Judge**

_____

**No. M2009-02400-COA-R3-PT - Filed May 12, 2010**

_____

Father appeals the trial court's termination of his parental rights.  Finding that Father was in substantial non-compliance with the permanency plan and that termination was in the child's best interest, the court's decision is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., and ANDY D. BENNETT, JJ., joined.

Thompson G. Kirkpatrick, Manchester, Tennessee, for the appellant, M. L.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General, and Joshua Davis Baker, Assistant Attorney General, Nashville, Tennessee, for the appellee, the Tennessee Department of Children's Services.

### OPINION

### I.  Factual and Procedural History

M. L. ("Father") was living with H. J. ("Mother") and her parents when he was arrested for selling drugs[1]; Mother was pregnant with Father's child at the time of Father's arrest.[2]  Father was subsequently convicted and sentenced to jail.  Mother gave birth to Casen J. on October 28, 2007, while Father was in jail.  Father was paroled in April of 2008 and lived in a halfway house before moving back into Mother's parents' house.

---

[1]  To protect the identity of the child, the parents' initials will be used in this opinion.

[2]  Mother and Father have never been married.  Father's paternity of the child was established by order of the Juvenile Court entered on October 21, 2008.

On June 8, 2008, the Department of Children's Services ("DCS") investigated a report that the child had suffered severe burns to his face, arms, and head. The child was taken to Vanderbilt Children's Hospital where he was diagnosed with second, third, and fourth degree burns to his scalp and second and third degree burns to his left ear, left cheek, right shoulder, right upper arm, and left hand. On June 9, the child was taken into DCS custody and Theresa Lawson was assigned as a caseworker. Mother's parents requested temporary custody of the child; DCS, however, did not consider them to be a viable placement option because Mother's mother tested positive for drugs and Mother's father was unable to provide a specimen.

DCS filed a Petition with the Coffee County Juvenile Court on June 10, seeking to adjudicate the child dependent and neglected and to find that Mother had severely abused him. In a deposition used in the dependent and neglect proceeding as well as the subsequent termination proceeding, Dr. Lisa Piercey, medical director of the child maltreatment program at Vanderbilt Children's Hospital, to whom Casen had been referred upon his admission, opined that the burns were caused by holding a hot iron to the child's head for several seconds and that the injuries were not the result of an accident. The court issued a Protective Custody Order giving temporary custody to DCS on that day. On November 20, 2008, the court held an adjudicatory hearing and by order entered March 18, 2009, held the child to be dependent and neglected, finding that he was the victim of severe abuse as defined in Tenn. Code Ann. § 37-1-102(b)(21)(A).[3]

On June 20, 2008, the child was released from the hospital and was placed into a foster home. Since then, the child has required extensive medical treatment, including a skin graft and to have a tissue expander inserted to help grow additional skin to cover the burned area; he will require additional surgeries in the future. On July 8, DCS prepared a permanency plan for the child, which required Father to: (1) attend a mental health, substance abuse, and parenting assessment and follow all recommendations of the assessor; (2) obtain a job and pay child support; (3) regularly visit the child; (4) refrain from illegal activity; and (5) provide a safe home for the child. Father signed the plan, acknowledging that he participated in drafting it and that he agreed with its recommendations; the plan was ratified by order entered on August 28.

Father visited the child seven times between July 9 and September 27, 2008, but did not visit with the child thereafter. On August 3, 2008, Father underwent a psychological assessment at a mental health clinic; the examiner recommended that Father begin outpatient mental health counseling and receive practical assistance to acquire the skills needed to

---

[3] Mother pled guilty to attempted aggravated child neglect and was sentenced to nine years and ten months in prison on July 8, 2009.

parent an infant. Father told Ms. Lawson that he did not need counseling and he never attended any sessions.

On October 9, 2008, Father told Ms. Lawson that Mother's parents had moved out of the house he was sharing with them; Ms. Lawson and the guardian ad litem visited the home later that day to confirm that Mother's parents no longer lived there. Upon an examination of the home, Ms. Lawson noticed indications that the parents were still residing there; she later returned to the home and observed Mother's parents at the residence. Upon a request for permission to conduct a second inspection, Father refused to allow Ms. Lawson to reenter the home. On November 12, a sheriff's deputy arrived at DCS with a warrant for Ms. Lawson's arrest, based on Father's allegation that she was harassing and stalking him. The warrant was ultimately dismissed and Father was charged with perjury and filing a false police report.

On January 29, 2009, a second permanency plan was created which was similar to the first plan, but added adoption as a goal; the court ratified the plan. On February 27, DCS filed a petition to terminate Father's and Mother's parental rights, alleging severe child abuse against Mother and substantial noncompliance with the permanency plan on the part of Father. On June 24, Father pled guilty to perjury and was sentenced to eleven months and 29 days in prison; in addition, the perjury conviction was a violation of his parole and Father was required to serve the remaining three years on his previous sentence.

A hearing was held on October 12, 2009, and, in an order entered on November 3, the court found that Father had failed to substantially comply with the terms of the permanency plan, that DCS made reasonable efforts to assist Father, and that termination of Father's parental rights was in the child's best interest.[4] Father raises the following issues on appeal;

> 1. Whether the trial court erred in ruling that DCS had proven by clear and convincing evidence that the Father was in substantial non-compliance with the permanency plan.

> 2. Whether the trial court erred in ruling that DCS had proven by clear and convincing evidence that termination was in the child's best interest.

## II. Standard of Review

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a

---

[4] Mother's parental rights were terminated as well; that decision is not a part of this appeal.

compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer,* 455 U.S. 745 (1982)). Terminating a person's parental rights "has the legal effect of reducing the parent to the role of a complete stranger." *In re W.B., IV.*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005). Pursuant to Tenn. Code Ann. § 36-1-113(1)(1), "[a]n order terminating parental rights shall have the effect of severing forever all legal rights and obligations of the parent or guardian of the child against whom the order of termination is entered and of the child who is the subject of the petition to that parent or guardian."

Our termination statues identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, 2005 WL 1021618, at *7 (citing Tenn. Code Ann. § 36-1-113(g)). To support the termination of parental rights, petitioners must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine,* 79 S.W.3d 539, 546 (Tenn. 2002); Tenn. Code Ann. § 36-1-113(c).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769; *Matter of M.W.A., Jr.*, 980 S.W.29 620, 622 (Tenn. Ct. App. 1998). Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.* at 653.

In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d at 654. As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

**III. Analysis**

*A. Substantial Noncompliance with the Permanency Plan*

Tennessee Code Annotated § 36-1-113(g)(2) authorizes termination of parental rights for failure to comply with a parenting plan as follows:

(2)  There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

Mere technical noncompliance by itself is not sufficient to justify the termination of parental rights since the statutory language requires the noncompliance to be "substantial." *In re S.H.*, No. M2007-01718-COA-R3-PT, 2008 WL 1901118, at *7 (Tenn. Ct. App. Apr. 30, 2008). In conjunction with terminating a parent's rights on the ground of substantial noncompliance, the trial court must find that the requirements of the permanency plan that the parent allegedly did not satisfy are "reasonable and related to remedying the conditions which necessitate foster care placement." *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(c)). In addition, the parent's degree of noncompliance with a reasonable and related requirement must be assessed. *In re S.H.*, 2008 WL 1901118, at *7. The issue of substantial noncompliance with the requirements of a permanency plan is a question of law; therefore, it is reviewed *de novo* with no presumption of correctness. *In re Valentine*, 79 S.W.3d at 546.

In the Petition to Terminate Parental Rights, DCS alleged that Father failed to substantially comply with the parenting plan requirements regarding safe housing and avoiding criminal activity.[5] At trial, Ms. Lawson testified that, after Casen was taken into DCS custody, Mother's parents' request for temporary custody was denied because Mother's mother tested positive for drugs, including opiates, and Mother's father was unable to provide a specimen. Ms. Lawson stated that she informed Father many times that Mother's parents' home was not suitable because "of the history with the...family and the drug use in the home." Ms. Lawson recounted the fact that Father had previously told her that Mother's parents had moved out of the house and that, upon her inspection, "it was evident to us that

---

[5] DCS also alleged that Father failed to comply with the requirement regarding mental health and parenting assessments and training. The trial court, however, did not find this requirement to be reasonable and related to remedying the conditions necessitating removal of the child, stating that Father's "failure to attend counseling was not a significant portion of the permanency plan, as the reasons identified for his attending further counseling were not significant barriers to his caring for the child." Father concedes that the rest of the plan's requirements were reasonable and makes no argument that DCS failed to make reasonable efforts to reunite him with the child.

[Mother's parents] had not moved out of the home." Ms. Lawson testified that, after this inspection of the home, a police deputy came to the DCS office with a warrant for her arrest on a charge of criminal trespass at Father's home. Ms. Lawson further testified that, after realizing that the warrant listed the DCS office as Ms. Lawson's home address, the deputy spoke by phone with the district attorney, who thereupon "dismissed" the warrant prior to Ms. Lawson's arrest. Sonya Stewart, a DCS caseworker, testified that Mother's parents had grandchildren, other than Casen, living in their home and that those children had been removed by DCS due to drug use by Mother's parents.

Father testified that he knew DCS had concerns about him living in Mother's parents' house but that he did not understand the concern because he believed they were "good...people"; he claimed to be unaware of Mother's parents' drug problems. Father testified that he would not return to Mother's parents' house after his release from prison and that he instead planned to get his own house. He admitted that the reason he sought out a warrant against Ms. Lawson was because he was trying to get her arrested and testified that he was convicted of perjury for filing the false report and that the conviction was the basis for his parole violation.

By order entered November 3, 2009, the court found Father to be in substantial non-compliance with the permanency plan requirements. With regard to the safe housing requirement, the court found that Father had been "advised by [DCS] on multiple occasions that his residing in the home of the child's maternal grandparent[s]...was not appropriate housing because of illegal drug use that the Department allege[d] was occurring in the home"; that Father "refused to consider the Department's directive that he move into another home" "which was safe and stable for him to live in with his child"; that Father's "failure to establish a safe stable home was due to his insistence that there was no problem with living with [Mother's parents], rather than an inability to obtain a home"; and that, "[a]t the time of trial, [Father] was incarcerated in prison" and had no plans for housing after his release. With regard to the illegal activity requirement, the court found that "staying law abiding was a condition without which the child could not return to live with his father" and that Father failed to comply with this requirement when he pled guilty to the perjury charge and caused his parole to be revoked.

Father asserts that the DCS "failed to prove by clear and convincing evidence that he was in substantial non-compliance" with the permanency plan, "taken as a whole"; he admits, however, that the requirements "that he refrain from illegal activities and that he maintain stable housing are the only two categories that [he] arguably did not fulfill." Father contends that DCS' concern with Mother's parents' house was related to an "abuse of opiates for which [Mother's parents] had prescriptions"; he concedes, however, that DCS "may well have a valid argument that [Father] breached the stable housing requirement" since, at the time of trial, he was housed at "the Tennessee Department of Corrections," which Father

agreed was "not appropriate housing." Father also argues that, while his perjury conviction was the result of "stupidity and bad judgment," DCS "overstated [the] importance" of his actions because he was a "hard worker who was respected by his employer, did not drink alcohol, and did not do drugs."

The record shows clearly and convincingly that Father was in substantial non-compliance with the permanency plan. Father argued at the trial court and persists to argue on appeal that Mother's parents' residence was a suitable home for the child and that, as a consequence, his failure to secure other housing was not substantial non-compliance with the permanency plan. Ms. Lawson and Ms. Stewart, however, testified that Mother's parents tested positive for drug use and had other children in their care removed from the home for that reason. Father lied to Ms. Lawson by telling her that Mother's parents no longer resided in the home, which, presumably, was an attempt by Father to alleviate DCS' concern regarding Mother's parents' presence in the home. Father presented no evidence to show that he attempted to secure housing necessary to adequately support the child and admits that, at the time of trial, he had failed to comply with the housing requirement as a result of his incarceration. Furthermore, Father's conviction on the perjury charge and resulting parole violation amounted to non-compliance of the requirement that he refrain from illegal activity. Contrary to his insistence that DCS overstated the importance of his actions leading to the perjury charge and that his actions were the unfortunate result of "bad judgment, we find that the commission of a criminal offense while on parole was substantial non-compliance and, in addition, prevented the achievement of the goal of reunification.

## B. Best Interest of the Child

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. The legislature has set out a list of factors for the courts to follow in determining the child's best interest. These factors are:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. §36-1-113.

The foregoing list is not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest. *See In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *State of Tennessee Dep't of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).

Father testified that he visited the child "roughly ten times" between July and October 2008 but that, at the time of trial, he had not seen the child in over year; he stated that he believed that the foster mother was doing a good job with him. Father initially admitted that Mother was his fiancé and that he intended to marry her when she was released from prison, but, upon questioning by his attorney, changed his mind in order to serve the "best interest for Casen" saying that his main goal was to "get [his] son back." The child's foster mother testified that she had been caring for Casen throughout all of his medical procedures, including going to the hospital and staying with the child "around the clock"; she is certified to care for "medically-fragile children." The foster mother testified that, in her care, the child is walking and learning to speak. She admitted that Father related well with the child, but stated that Father had not been to see him since October of 2008. The foster mother testified that she and her husband were willing to adopt the child.

The trial court determined that termination of Father's parental rights was in the best interest of the child pursuant to subsections (2), (3), (4), and (7) of Tenn. Code Ann. § 36-1-113 and an additional factor, finding specifically that:

> a.  It is in the child's best interests for termination to be granted, because [Father] ha[s] [not] made lasting changes in [his] lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible.  As indicated above, [Father] is less prepared to care for the child at the time of trial than sixteen months previous.[6]
> b.  It is in the best interest of the child for termination to be granted because there is crime in [Father's] home.
> b. [sic]  It is in the child's best interests for termination to be granted, because [Father has] not maintained regular visitation with the child. . .The father attended approximately 25 percent of the visitation afforded to him between July and December 2008.  He ha[d] not visited the child in the past 12 months.
> c.  It is in the child's best interests for termination to be granted, because there is no meaningful relationship between the child and [Father].
> \*\*\*
> g.  It is in the child's best interests for termination to be granted, because the child has established a strong bond with his foster parents and their family, who have demonstrated their commitment to the child throughout the multiple surgeries and postoperative periods.  From the evidence of the care the foster parents have demonstrated throughout the medical procedures, and their painful aftermath, the court finds by clear and convincing evidence that Casen [J.] has [a] notably meaningful relationship with the foster parents, who desire to adopt the child if allowed to do so.

The court also found that Father "ha[d] not established that he can keep this child safe" because the court believed that Father "ha[d] every intention of reuniting with the individual [Mother] who was responsible for the child's horrific injuries."

On appeal, Father addresses each of the factors set forth in Tenn. Code Ann. § 36-1-113.  Father asserts that subsection (1), (2), (6), and (8) do not apply because the conditions which led to the child's removal did not pertain to Father, Father had not abused the child, and Father did not have any mental or emotional concerns that would prevent him from effectively caring for the child.  With regard to regular visitation, Father contends that this factor weighs in his favor because of his testimony that he "visited almost every weekend."  Father argues that he was not able to visit as often because the foster parents lived in another

---

[6]  In its order, the court previously stated that Father "had been incarcerated for 10 months and is at this time less prepared to safely care for his child than at the time of the child's removal in June 2008."

town, he did not have a driver's license, and he worked full-time. With regard to the existence of a meaningful relationship, Father asserts that this factor does not weigh in favor of either party because of the child's age and the child's foster mother's testimony that, during visitations, Father related well with the child. With regard to a change of caretaker and physical environment, Father asserts that this factor does not weigh in favor of either party because, given the child's age, "there is very little emotional or psychological trauma at stake." With regard to the physical environment of Father's home, Father concedes that this factor weighs in favor of DCS "given that [he] was incarcerated...at the time of the Trial"; he points out that he had not been accused of using drugs or alcohol while living at Mother's parents' house. With regard to child support, Father contends that this factor weighs in his favor since "it is conceded that [he] maintained gainful employment and paid child support during his release from custody."

Upon a review of the record, we find that termination of Father's parental rights is in the best interest of the child. Even though he maintained employment and paid child support prior to his incarceration, Father failed to maintain regular visitation with the child, failed to establish a meaningful relationship with the child, and failed to secure a home free of criminal activity and drug use. From the time he was placed into a foster home, Casen has received the medical care he needed and was provided a safe environment where has continued to mature. Contrary to Father's assertion, we believe that a change in Casen's caretakers and physical environment would have a detrimental effect on his emotional, psychological and medical condition since, at the time of trial, Father had not seen the child in over a year, had not establish a relationship with the child, was unable to provide suitable housing for the child, and is unfamiliar with the child's special medical needs. In addition, we agree with the trial court that the best interest of the child would not be served by placing him with Father after he expressed an intent to reunite with Mother. For the foregoing reasons, we find that termination of Father's parental rights is in the best interest of the child.

## IV. Conclusion

For the reasons set forth above, the trial court's judgment is AFFIRMED. Costs of this appeal are assessed against Father.

_____
RICHARD H. DINKINS, JUDGE