IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 9, 2010

IN RE BRANDON T. ET AL.

Appeal from the Juvenile Court for Sumner County
No. 2007-JV-1470      Barry R. Brown, Judge

No. M2009-02459-COA-R3-PT - Filed September 8, 2010

Parents appeal the trial court's termination of their parental rights. Because we find that DCS failed to prove by clear and convincing evidence that it had made reasonable efforts to address the problems preventing the reunification of the children with their parents, we reverse.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

Bruce N. Oldham, Gallatin, Tennessee, for the appellant, Elizabeth T.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Lindsey O. Appiah, Assistant Attorney General; for the appellee, State of Tennessee, Department of Children's Services.

Virginia K. Tompkins, Castalian Springs, Tennessee, Guardian Ad Litem.

OPINION

FACTUAL AND PROCEDURAL BACKGROUND

Elizabeth T. ("Mother") and Tony T. ("Father") are the parents of four children, Brandon T. (born in 2003), Dakota T. (born in 2005), Kelsey T. (born in 2006), and Shyan T. (born in 2008). The three oldest children came into the custody of the Department of Children's Services ("DCS") on November 8, 2007, after DCS received a referral indicating that Brandon T. came to school with what appeared to be a handprint on his face. The family

had been living in a car for about two weeks. Father was arrested on one count of child abuse and three counts of child neglect; Mother was arrested on three counts of child neglect. DCS filed a dependency and neglect petition and was granted protective custody of the three children.

DCS determined that there was no suitable family placement and placed the three children with a foster family. Shortly after her birth in March 2008, Shyan also came into DCS custody and was placed with the same foster family. The three oldest children were adjudicated dependent and neglected on March 18, 2008. Shyan was adjudicated dependent and neglected on July 22, 2008.

DCS filed a petition to terminate parental rights on November 7, 2008, against Mother and Father. The petition included a number of grounds for termination with respect to each parent. A trial took place over three days in May, June, and October 2009. On November 16, 2009, the juvenile court entered final orders terminating the parental rights of Mother and Father to their four children. Both parents have appealed.

STANDARDS FOR TERMINATION OF PARENTAL RIGHTS

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Terminating a person's parental rights "has the legal effect of reducing the parent to the role of a complete stranger." *In re W.B., IV*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005). Pursuant to Tenn. Code Ann. § 36-1-113(l)(1), "[a]n order terminating parental rights shall have the effect of severing forever all legal rights and obligations of the parent or guardian of the child against whom the order of termination is entered and of the child who is the subject of the petition to that parent or guardian."

Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, 2005 WL 1021618, at *7 (citing Tenn. Code Ann. § 36-1-113(g)). To support the termination of parental rights, petitioners must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). A trial court is only required to find one statutory ground in order to terminate parental rights. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.*

In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *Id.* at 654. As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

ISSUES ON APPEAL

The trial court found multiple grounds for terminating the parental rights of Mother and Father. With respect to Mother, the court cited willful abandonment by failure to provide a suitable home; substantial noncompliance with the permanency plans; and persistence of conditions. With respect to Father, the court found willful abandonment by failure to visit or support for more than four months prior to incarceration as well as wanton disregard for the children's welfare prior to his incarceration; willful abandonment by failure to provide a suitable home; substantial noncompliance with the permanency plans; and persistence of conditions. On appeal, Mother and Father assert that DCS failed to meet its burden of proof regarding all of these grounds. DCS expressly chose not to address the grounds of abandonment and substantial noncompliance on appeal, relying solely on the ground of persistence of conditions. The guardian ad litem's brief addresses only the grounds of substantial noncompliance and persistence of conditions. We consider those grounds not addressed by either DCS or the guardian ad litem on appeal to be waived. Therefore, we must determine whether clear and convincing evidence supports the termination of Mother's and/or Father's parental rights based upon substantial noncompliance with permanency plans and persistence of conditions.

ANALYSIS

Pursuant to Tenn. Code Ann. § 36-1-113(g)(2), termination of parental rights may be based upon "substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4."[1] Tenn. Code Ann. § 36-1-113(g)(3) authorizes the termination of parental rights under the following conditions:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

With respect to both termination grounds, substantial noncompliance under Tenn. Code Ann. § 36-1-113(g)(2) and persistence of conditions under Tenn. Code Ann. § 36-1-113(g)(3), DCS must generally prove by clear and convincing evidence that "it made reasonable efforts to reunite the family and that these efforts were to no avail."[2] *In re Giorgianna H.*, 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006).

---

[1]Tenn. Code Ann. § 37-2-403(a)(2) sets out the requirements for permanency plans. Subsection (a)(2)(C) states that substantial noncompliance by the parent with the responsibilities listed in the permanency plan provides grounds for termination of parental rights "if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement."

[2]There are exceptions to the requirement of proving reasonable efforts, but they do not apply in this case. *See In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. Mar. 9, 2004).

Factors to be considered by courts in determining the reasonableness of DCS's efforts include the following:

> (1) the reasons for separating the parent from his or her children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*Id.*

In this case, the conditions that led to the children's removal from the home include housing instability and the parents' inability to support them. DCS also points to evidence of other conditions preventing reunification. With respect to Mother, DCS argues that she continued to exhibit an inability to adequately parent the children and associated with inappropriate people.[3] With respect to Father, DCS emphasizes his longstanding unemployment and time in jail in addition to housing instability. For purposes of evaluating DCS's efforts at reunification, those services required to resolve the parents' most pressing deficits should receive priority. *See In re Randall B., Jr.*, No. M2006-00055-COA-R3-PT, 2006 WL 2792158, at *8 (Tenn. Ct. App. Sept. 28, 2006); *In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *14-15 (Tenn. Ct. App. June 30, 2005).

As discussed below, our review of the record leads to the conclusion that DCS failed to meet its burden of proving reasonable efforts by clear and convincing evidence.

I.

With respect to the three oldest children, the record does not contain sufficient evidence to evaluate the reasonableness of DCS's efforts.

Tenn. Code Ann. § 37-1-166(c) requires DCS to provide the court with an affidavit of reasonable efforts:

> To enable the court to determine whether such reasonable efforts have been made, the department, in a written affidavit to the court in each proceeding

---

[3]These associations include Mother's stepfather, a convicted sex offender, and her current boyfriend, who was previously "indicated" by DCS in another county for neglect or abuse.

where the child's placement is at issue, shall answer each of the following questions:

(1) Is removal of the child from such child's family necessary in order to protect the child, and, if so, then what is the specific risk or risks to the child or family that necessitates removal of the child?;

(2) What specific services are necessary to allow the child to remain in the home or to be returned to the home?;

(3) What services have been provided to assist the family and the child so as to prevent removal or to reunify the family?; and

(4) Has the department had the opportunity to provide services to the family and the child, and, if not, then what are the specific reasons why services could not have been provided?

There is no pertinent affidavit of reasonable efforts in the record in this case.[4] We have previously determined that DCS's failure to file an affidavit of reasonable efforts "is not fatal if the Department introduces competent evidence specifically identifying the services required in the permanency plan, the services actually provided to the parents, and the outcomes of these services." *In re C.M.M.*, 2004 WL 438326, at *8. In this case, however, the record is also deficient in that the relevant permanency plans are not in the record with respect to the three oldest children.[5]

In its termination petition, DCS cited initial permanency plans dated November 20, 2007, and revised plans dated July 17, 2008. These plans were never introduced into

---

[4]The only affidavit of reasonable efforts in the record was completed in April 2008 in conjunction with the initial removal of Shyan from her parents' custody.

[5]This court has previously held that, in order to prevail on a claim of substantial noncompliance with a permanency plan, DCS must prove the terms of the plan. *In re T.N.L.W.*, No. E2006-01623-COA-R3-PT, 2007 WL 906751, at *4 (Tenn. Ct. App. Mar. 26, 2007); *Dep't of Children's Svcs. v. D.W.J.*, No. E2004-02586-COA-R3-PT, 2005 WL 1528367, at *3 (Tenn. Ct. App. June 29, 2005). Thus, "when DCS is relying on substantial noncompliance with the permanency plan as a ground for termination of parental rights, it is essential that the plan be admitted into evidence." *In re T.N.L.W.*, 2007 WL 906751, at *4; *see also In re A.J.R.*, No. E2006-01140-COA-R3-PT, 2006 WL 3421284, at *5 (Tenn. Ct. App. Nov. 28, 2006); *D.W.J.*, 2005 WL 1528367, at *3; *State v. B.B.M.*, No. E2004-00491-COA-R3-PT, 2004 WL 2607769, at *5 (Tenn. Ct. App. Nov. 17, 2004). Thus, at least with respect to the oldest three children, the ground of substantial noncompliance could not be established. As noted above, DCS did not address the ground of substantial noncompliance on appeal, but the guardian ad litem did argue this ground on appeal.

evidence, however.[6] The record contains an initial permanency plan regarding Shyan but no initial permanency plans for the other three children. The only permanency plans in the record with respect to the oldest three children are revised permanency plans dated October 20, 2008, shortly before the filing of the petition for termination on November 7, 2008. At the hearing, several witnesses testified generally about the permanency plans, but DCS never gave a detailed account of the plan requirements. Given the absence of an affidavit of reasonable efforts, relevant permanency plans, or specific proof regarding the permanency plan requirements, the trial court could not properly determine by clear and convincing evidence that DCS had met its burden of proof on reasonable efforts regarding the three oldest children.

## II.

As to the youngest child, Shyan, the record does contain an initial permanency plan dated March 26, 2008. Thus, with respect to Shyan, we can determine the services required under the permanency plan. *See In re C.M.M.*, 2004 WL 438326, at *8.

Shyan's permanency plan sets out desired outcomes designed to promote reunification with parents and specific actions needed to achieve those desired outcomes. With regard to Father, the desired outcomes are that he will have stable housing, resolve all legal charges, provide for Shyan, be able to parent Shyan and make sure she reaches milestones, and have his mental health needs met. As to the first three outcomes, the permanency plan states that Father is the responsible party for all of the actions needed to achieve the desired outcomes. With respect to Father's ability to parent Shyan, the actions needed are for him to undergo a parenting assessment and follow all recommendations and to be trained in CPR and First Aid. DCS is a responsible party, along with Father, on both of these actions. On the final desired outcome related to Father's mental health, DCS is a responsible party with respect to two of the needed actions: a clinical assessment and counseling, if recommended.

What services did DCS actually provide to Father? At the hearing, there was testimony that DCS gave Father a list of felon-friendly employers and informed him of some places that were hiring. Kaleesha Simmons, the DCS caseworker for Mother and Father beginning in April 2008, testified that according to the records left by the previous caseworker, DCS offered Father services to help him locate housing, but he was living with a girlfriend and declined services. Father denied being offered assistance by DCS at that time. Most of the services offered to Father, however, had to do with parenting. While Father initially declined a parenting assessment, he later completed the assessment.

---

[6]From the testimony of Ms. Simmons, the DCS caseworker, it appears that these permanency plans were never ratified by the court.

According to Ms. Simmons, the only recommendation from the parenting assessment was family counseling. Father was in jail at that time, so DCS provided him with individual counseling with Cheryl McAdams until her services ended (due to lack of funding).

Ms. McAdams, an employee of a DCS contractor, testified that she met with Father several times during his incarceration to help him with his parenting skills but had never been able to observe him with the children. Once Father was released from jail, the petition for termination had already been filed and there was no funding available for additional parenting services. Ms. McAdams was more confident that Father could properly parent than she was with respect to Mother. She thought it was possible that, if additional parenting services were available, Father could be reunited with the children. It is not clear from the record whether Father received a clinical assessment regarding his mental health needs. DCS did not introduce a parenting assessment or clinical assessment into evidence.

Shyan's permanency plan gives the following desired outcomes regarding Mother's reunification with the child: Mother is to have stable housing, resolve all legal charges, provide for Shyan, be able to parent Shyan and ensure she reaches her milestones, and have her own mental health needs met. On the housing issue, the permanency plan lists three actions needed, with DCS or its agents having shared responsibility with Mother's attorney on the third action: "If the current housing situation does not work out, the team will work together to identify another housing situation."[7] Mother is the sole responsible person for the actions needed for resolving her legal charges and providing for Shyan. DCS and Mother have joint responsibility for the actions required for being able to parent Shyan: Mother is to undergo a parenting assessment and follow the recommendations and be trained in CPR and first aid. With respect to the final desired outcome, mental health needs, Mother has the responsibility for undergoing a clinical assessment and follow the recommendations, while DCS is responsible for requesting the assessment and providing counseling, if recommended.

What services did DCS actually provide to Mother? To help Mother with her parenting skills, Ms. McAdams worked with Mother for several months near the end of 2008, but DCS discontinued her services when funding ran out. She expressed concern that Mother did not seem to understand how to implement the skills she was being taught. Ms. McAdams observed Mother's interactions with the children and described her as being "disconnected from the children." She felt that supervised visits were not appropriate and feared that the children would be at risk because Mother would not provide adequate supervision. Ms. McAdams stated that, although her services had been discontinued, she doubted that Mother

---

[7]Mother lived at a residential facility for the elderly for a period of time through an arrangement worked out by Mother's attorney whereby Mother worked in exchange for a place to live. Mother eventually chose to leave the facility and move into a rental mobile home paid for in large part by her mother.

could improve significantly with further services due to suspected emotional and cognitive limitations.

Kristi Yates, an employee of Residential Services, Inc., a DCS contractor, testified that she supervised visits with both parents. Initially, she provided guidance and support for Mother to assist her in learning better parenting skills; later on, she was instructed to take a more observational role to see how Mother would do on her own. Ms. Yates testified that Mother had trouble engaging with and controlling the children during visits at McDonald's and similar locations. She opined that Mother's visits would improve if they were in a home environment. She observed that Mother did better when she could supervise one child but had trouble with all four together.

Ms. Simmons, DCS caseworker, testified that DCS provided Mother one month's rent and one month's electricity payment after Mother moved into housing in October 2008.[8] Ms. Simmons testified in May 2009 that she took Mother to eight places to apply for employment. According to Ms. Simmons's testimony, Mother did participate in a clinical assessment, a parenting assessment, and anger management.[9] She testified that the assessment[10] concluded that Mother was limited in her ability to care for and nurture the children, and if the children were to be placed in her custody, it was recommended that she have continued in-home counseling, both individual and family, with specific emphasis on abuse and avoiding contact between the children and anyone with whom Mother was romantically involved until that person could participate in family counseling. Ms. Simmons expressed doubt that any further services would enable Mother and Father to be able to have custody of the children, noting that neither parent had been able to move to unsupervised visits.

Although DCS established desirable and appropriate goals in Shyan's permanency plan, we do not find clear and convincing evidence that the specific individualized services identified in the permanency plan and/or provided by DCS constitute reasonable efforts. At the hearing, Ms. Simmons testified that her biggest concerns about Father were "a legal

---

[8]Mother's mother provided ongoing financial assistance to allow Mother to maintain housing beginning in October 2008. Mother could not live with her mother because of the presence of her stepfather, a convicted child abuser.

[9]No parenting assessments, clinical assessments, or records documenting other services appear in the record.

[10]It is unclear whether Ms. Simmons is referring to the clinical interview for mental health purposes or the parenting assessment.

means of income and safe and suitable housing."[11]  Yet, on Father's permanency plan for Shyan, DCS is not listed as a responsible party with respect to  housing or a legal means of income.  DCS provided Father with a list of felon-friendly employers, but this court has previously stated that DCS "must do more than simply provide the parents with a list of services and send them on their way." *In re Giorgianna H.*, 205 S.W.3d at 519.  When asked about the possibility of providing employment rehabilitation and training, Ms. Simmons was not knowledgeable about the available services.

According to the testimony of Ms. Simmons, the main barrier to Mother's reunification with the children was her apparent inability to provide for their needs.  At the time of the October hearing, Mother had been in her own housing for 13 months with financial support from her mother.  DCS would not accept Mother's dependence upon her mother for support because this was not a reliable source.  In May 2009, Mother had provided proof of income[12] and a receipt from her landlord for one month, but the permanency plan required her to do so for three months. Ms. Simmons stated that if the children were returned to Mother, DCS would accept public assistance as a source of income. She testified that she did not take Mother to the Department of Human Services to get an estimate of the resources available to her.  On the final day of the hearing in October 2009, Ms. Simmons stated that she had not provided Mother any more assistance regarding finding employment (since taking her around to employers prior to the May 2009 hearing).

We further note that, with respect to Mother, DCS expressed significant concerns about her parenting abilities.[13]  In light of Mother's compliance with the parenting assessment, visitation, and training, DCS seems to be taking the position that Mother is incapable of adequately parenting her children.  We do not consider the present record to contain clear and convincing evidence of such irreparable deficits.  While several witnesses, including the parenting trainer, testified about their reservations concerning Mother's capacity to supervise and care for the children, the visitation supervisor acknowledged that Mother might do better in a home environment rather than being at McDonald's for several hours. No records from parenting assessments, clinical assessments, or individual counseling for either parent were presented at the hearing. While Mother may indeed have cognitive and emotional deficits that impair her ability to care for her children, DCS has failed to provide clear and convincing evidence to support this claim.

---

[11]At the time of the hearing, Father was living with his grandparents.

[12]Ms. Simmons testified that Mother later lost this job.

[13]In addition to the witnesses already mentioned, DCS introduced testimony of another residential case manager concerning Mother's poor parenting skills at visitations.

Nothing in this opinion should be interpreted as approving the actions of the parents in this case. The preponderance of the evidence supports the trial court's factual findings concerning the deplorable situation of the three oldest children when they were taken into custody and the continuing instability of the parents at the time of the hearing. We cannot find, however, based upon the deficient state of the record, that DCS met its burden of proving by clear and convincing evidence that it made reasonable efforts toward reunification.

CONCLUSION

The judgment of the trial court is reversed. Costs of the appeal are assessed against DCS, for which execution may issue if necessary.

_____

ANDY D. BENNETT, JUDGE