# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
June 15, 2010 Session

## IN RE AUSTIN H. ET AL.

### Appeal from the Juvenile Court for Sequatchie County
No. 773004, 773005, 773654     L. Thomas Austin, Judge

No. M2010-00209-COA-R3-PT - Filed September 16, 2010

Mother's parental rights to her three children were terminated. We affirm, finding that there was clear and convincing evidence that Mother did not meet the reasonable requirements of the parenting plans and that persistent conditions existed. We further find that DCS used reasonable efforts to reunite the family. Finally, we find that termination of Mother's parental rights is in the best interest of the children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

Alice W. Wyatt, Dunlap, Tennessee, for the appellant, Leslie H.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Kimberly J. Dean and Joshua Davis Baker, Assistant Attorneys General; for the appellee, State of Tennessee, Department of Children's Services.

Russell Anne Swafford, Nashville, Tennessee, Guardian Ad Litem.

## OPINION

### BACKGROUND

This matter began on March 7, 2008,[1] when Leslie H. ("Mother") left her children without supervision – Austin, age 11, was left in charge of six other children. DCS was awarded temporary legal custody. On March 20, 2008, Mother waived adjudication and the juvenile court found the children to be dependent and neglected. Custody remained with DCS. Permanency plans were developed for the three children. Mother participated in the plan meeting by phone due to her incarceration and gave her approval of the plans. She was released from jail May 13, 2008.

Mother lived with Grandmother for a month and then moved to Chattanooga to live with her father. Grandmother reported to DCS that Mother was involved in prostitution. DCS family service worker Heather Rudez found Mother on a street corner in Chattanooga. Mother admitted that she was on drugs and declined an offer to take her to CADAS for treatment. By August 13, 2008, Mother was incarcerated in Chattanooga. By October, she was incarcerated in Rhea County. In November, she was moved to the Sequatchie County Jail.

The juvenile court examined this case every three months. In the order arising from the November 21, 2008 hearing, the court noted that DCS was "considering filing [for] the termination of parental rights due to the lack of progress in this matter." The court found that "the Department is utilizing reasonable efforts for reunification with the added difficulty of the mother's incarceration at this time."

Mother left the Sequatchie County Jail on December 29, 2008, to enter drug treatment at The Hope Center in Nashville. The next day DCS filed a petition to terminate the parental

---

[1]This is not the first time, however, that the issue of the custody of these children has arisen. In February 2002, Mother's sister and her then brother-in-law received temporary custody of the two oldest children (the third had yet to be born) due to Mother's drug use and absence and Father's absence. The children had been living with the maternal grandmother ("Grandmother") until an incident led to the filing of an emergency temporary custody petition. A petition for temporary custody was filed by Father, Tony H., in July 2004. The Department of Children's Services ("DCS") filed a petition for temporary custody on August 17, 2004, after a DCS representative visited the children's home and found Grandmother intoxicated, kicking the walls, and screaming. After a period of DCS custody, the children were placed in the custody of Father in November 2004. The next document in the record is a November 2007 DCS petition seeking authority to complete an investigation without Mother's consent. Mother apparently had custody of the children, now including a third child who is not the child of Father. Then, in March 2008, DCS sought emergency temporary custody of the three children.

rights of Mother and Father[2] based on abandonment by failure to visit (Father only), abandonment by incarcerated parent (Mother only), substantial noncompliance with the permanency plan (both), and persistence of conditions (Mother only).

In February 2009, the permanency plans were revised. Goal A remained "Return to Parent," but Goal B became "Adoption." In September, the plans were revised again to make Goal A "Adoption," and Goal B "Return to Parent."

Mother continued to have problems. In the fall of 2009, Mother was arrested in Chattanooga for possessing drug paraphernalia. She also testified to a suicide attempt.

A hearing was held on November 9, 2009, on the petition to terminate parental rights. The court terminated Father's rights based on abandonment.[3] Mother's parental rights were terminated as well, based on abandonment by wanton disregard for the children's welfare, substantial noncompliance with the permanency plans, and persistence of conditions. The court then found, by clear and convincing evidence, that termination of both parents' parental rights was in the best interest of the children. Mother appealed.

STANDARDS FOR TERMINATION OF PARENTAL RIGHTS

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Consequently, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). The termination of a person's parental rights "has the legal effect of reducing the parent to the role of a complete stranger." *In re W.B., IV*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *6 (Tenn. Ct. App. Apr. 29, 2005). Pursuant to Tenn. Code Ann. § 36-1-113(l)(1), "[a]n order terminating parental rights shall have the effect of severing forever all legal rights and obligations of the parent or guardian of the child against whom the order of termination is entered and of the child who is the subject of the petition to that parent or guardian."

---

[2]DCS sought to terminate the parents' rights to all three children. Although Father is listed on the birth certificate as the father of the third child, parents admit that Father cannot be the father of the third child since that child is biracial. It was alleged that Mother did not know who the father of the child might be because Mother was working as a prostitute when he was conceived.

[3]Father does not contest the termination of his parental rights.

Tennessee's termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, 2005 WL 1021618, at *7 (citing Tenn. Code Ann. § 36-1-113(g)). To support the termination of parental rights, petitioners must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). A trial court is only required to find one statutory ground in order to terminate parental rights. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004) (citations omitted). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.*

In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *Id.* at 654. As to the trial court's findings of fact, our review is de novo with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

ANALYSIS

Permanency Plans

A permanency plan is "a written plan for a child placed in foster care with the department of children's services . . . ." Tenn. Code Ann. § 37-2-402(8). DCS must prepare a permanency plan for each child in its foster care. Tenn. Code Ann. § 37-2-403(a)(1). The plan must state the goal, such as "return to the parent" or "adoption." Tenn. Code Ann. § 37-2-403(a)(1)(A)-(E). The permanency plan must "include a statement of responsibilities between the parents, the agency and the caseworker of such agency. Such statements shall

include the responsibilities of each party in specific terms and shall be reasonably related to the achievement of the goal specified . . . ." Tenn. Code Ann. § 37-2-403(a)(2)(A).

The purpose of a permanency plan is to make sure all parties understand what is required of them. The consequences of failing to comply with the plan are significant, especially for the parents. Substantial noncompliance by the parents with their responsibilities under the parenting plan is a ground for termination of their parental rights. Tenn. Code Ann. § 36-1-113(g)(2). Of course, in order for a parent to be in jeopardy of losing parental rights, the noncompliance with requirements in a permanency plan must be substantial and relevant. Failing to meet requirements that are neither reasonable nor related to remedying the conditions that led to the removal of the child from the parents' custody is not relevant for purposes of Tenn. Code Ann. § 36-1-113 (g)(2). *In re Valentine*, 79 S.W.3d at 548-49. Substantial noncompliance is a question of law which is reviewed de novo with no presumption of correctness. *Id*. at 548.

"Mother does not deny that she has been unable to satisfy the requirements of the permanency plan before the juvenile court terminated her rights." Appellant's Brief, p. 18. Mother maintains that the permanency plans were not reasonable and related to remedying the conditions that necessitated foster care. Specifically, she argues that the time parameters of the plans and the failure of the plans to address Mother's psychological problems rendered the plans unreasonable and unrelated to the conditions that necessitated foster care for the children.

Mother claims that the six-month time period of the plans put undue and unrealistic pressure on her when DCS knew that Dr. Greaves felt "Mother would need at least 12-18 months to tackle her demons, learn how to effect lasting changes in her life, and achieve the goal of reunification with her children." It is true that the first plans were established March 27, 2008, and the goal target date was September 8, 2008. There appears to be nothing on the permanency plan form that indicates September 8, 2008, was a "hard and fast" date. Indeed, state law provides that "[s]uch [permanency] plans are subject to modification and shall be reevaluated and updated at least annually."[4] Tenn. Code Ann. § 37-2-403(a)(1). Subsequent plans list the expected achievement dates for Mother's responsibilities as December 8, 2008, August 24, 2009, and March 29, 2010.[5]

---

[4]We note that the court reviewed the status of the matter every three months.

[5]This date, of course, was never reached because the primary goal under the final plan switched to adoption. Adoption required the termination of parental rights. Had Mother's rights not been terminated, the plan would have given her until March 29, 2010, to meet her responsibilities.

We do not view the target dates as unreasonable and unrelated to the conditions that necessitated foster care for the children. It is important to reunite families in a timely manner. Mother was given time to work on her responsibilities. The time period between the establishment of the first parenting plan and the termination hearing was approximately 20 months. Yet, during this period Mother was incarcerated several times, continued to return to drug use, and did not establish a stable home or maintain a legal income. Mother had time to "tackle her demons" had she been willing.

Mother claims that the root cause of her problems was psychological and that the plans did not address her psychological issues and needs. Therefore, her argument goes, the plans were not reasonable and, it follows, DCS's efforts were not reasonable.

DCS admits that "[t]he permanency plans did not provide for psychological treatment for [Mother]," but offers two responses to Mother's argument. First, DCS says that Mother was offered opportunities for psychological treatment but did not avail herself of them. DCS family service worker Heather Rudez testified that she offered to provide services "to help with working through this depression to prevent her from going back to drug use." Mother did not respond to Rudez's request for information. Mother also left a drug treatment program before it was completed. Had she completed the program, she would have been eligible for a halfway house program where she would have had access to their drug addiction therapy system and their support system.

Second, DCS argues that Mother's memory problems prevented her from benefitting from therapy. Dr. Greaves, a therapist who treated Mother in 2007, testified: "She could not remember things or remember how to do things. So even in working on the structure of the household, if I made suggestions they were pretty much lost, I think, shortly after she walked out of the office."

We do not find the lack of an express requirement for psychological therapy to be unreasonable. DCS's custody was precipitated by Mother's arrest for child neglect, possession of drug paraphernalia, and the lack of appropriate relatives with whom to place the children. The permanency plans and DCS's actions[6] were squarely aimed at these problems.

---

[6]DCS's efforts need not be "herculean." *In re A.R.*, No. M2007-00618-COA-R3-PT, 2007 WL 4357837 at *5 (Tenn. Ct. App. Dec. 13, 2007). DCS is required to use "reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). DCS's efforts gave Mother opportunities to change, but she did not take advantage of them. As the saying goes, "you can lead a horse to water, but you can't make him drink."

Clear and compelling evidence exists of Mother's substantial noncompliance with the permanency plans. Mother's failure constitutes grounds for the termination of the parent-child relationship under Tenn. Code Ann. § 36-1-113(g)(2).

## Persistent Conditions

Next, Mother claims the permanency plans were not reasonably related to remedying the persistent conditions that caused the removal of her children because they did not address her "untreated psychological damage." This argument is merely a rehash of the arguments already made and rejected.

Mother continued to use drugs. She had no home and no legal source of income. We find that there is clear and convincing evidence that the conditions which required the removal of the children from the home persisted, there is little likelihood of that these conditions will be remedied at a early date, and that the continuation of the parent-child relationship diminishes the child's chances of early integration into a safe, stable and permanent home. The grounds for termination of the parent-child relationship exist under Tenn. Code Ann. § 36-1-113(g)(3).

## OTHER GROUNDS

Mother questions whether an abandonment by wanton disregard can be found where the parent reasonably believes her conduct was not inappropriate under the circumstances. We need not address this argument. Only one statutory ground for termination need be proved, so long as it is proved by clear and convincing evidence. See *In re D.L.B.*, 118 S.W.3d at 367. We have already found that there is clear and convincing evidence that the permanency plans were appropriate. Mother has admitted that she has not complied with the permanency plans. Consequently, grounds exist for termination of Mother's parental rights under Tenn. Code Ann. § 36-1-113(g)(2). Furthermore, as already explained in the course of this opinion, the record contains clear and convincing evidence that supports the trial court's conclusion that grounds for termination of Mother's parental rights under Tenn. Code Ann. § 36-1-113(g)(3), the persistent conditions provision, existed. Thus, two grounds are established. Any further discussion of Mother's failures is cumulative and unnecessary.

## BEST INTEREST

In addition to proving one or more of the grounds for termination, DCS must prove that termination of Mother's parental rights is in the children's best interest. Tenn. Code Ann. § 36-1-113(c)(2). Mother continued to resort to drugs. At the time of the hearing, she had no home. In fact, she was incarcerated in the Rhea County Jail.

The record contains testimony concerning Mother's persistent problems and how they continued to hamper her parenting abilities. Dr. Greaves testified that she was not convinced Mother could be a reliable parent even when she was clean and sober. Dr. Greaves stated that it would be detrimental to the children if they were returned to Mother in a "non-sober, unstable, chaotic environment." Similarly, Dr. Glennon, Mother's former psychologist, testified:

Q   Absent a significant period of stability and a significant period of sobriety in this woman's life, do you believe that any child in her custody would be in danger?

A   It would certainly be difficult to conceive that she could safely raise a child without that period and that much progress, yes.

Ms. Rudez testified as follows:

Q   Are you any closer to returning them [the children] to their mother today than you were the very first day you got this case?

A   No.

Q   You filed this petition asking this Court to terminate her parental rights?

A   Correct.

Q   Tell the Court exactly why you feel that termination is appropriate in this particular case.

A   I know that [Mother] loves her kids. I know that from the deepest part of my heart. I understand that. I also know that [Mother] suffers from this debilitating drug addiction and because she's not able to work through her past and get through that, she's not capable of providing that stable home that her children need.
Her boys have thrived since they've had that stability.

Ms. Rudez also testified:

Q   Do you foresee being able to ever return these children to their mother based on what you've seen from her in the past 18 months?

A   No. It's been a repeat of the same cycle.

The record is replete with clear and convincing evidence that it is in the children's best interest to terminate Mother's parental rights.

CONCLUSION

The trial court is affirmed. Costs of appeal are assessed against the appellant, for which execution may be issued if necessary.

_____
ANDY D. BENNETT, JUDGE