IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 7, 2011

IN RE  BILLY D. H.[1]

**Appeal from the Juvenile Court for Fentress County**
**No. J3281     John R. Officer, Judge**

**No. M2011-00797-COA-R3-PT - Filed December 29, 2011**

Mother's parental rights to her son were terminated on grounds that she was mentally incompetent to provide for the child and that the conditions which led to the child's removal from Mother's custody persisted. She appeals, contending that the grounds are not supported by the evidence and that termination of her rights was not in the best interest of the child. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR. and ANDY D. BENNETT, JJ., joined.

Kevin D. Poore, Crossville, Tennessee, for the appellant, Jerus H. N.

Robert E. Cooper, Jr., Attorney General and Reporter; Michelle N. Safer, Assistant Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual and Procedural History**

Billy D. H. ("Billy") was born on September 10, 1998 to Jerus H. N. ("Jerus") and her then husband, Michael H. ("Michael"). A divorce action was instituted in Fentress County Circuit Court on May 17, 2002 and on April 1, 2005, a divorce was granted; Jerus was named primary residential parent of Billy. On July 19, 2005, Michael filed a petition seeking a modification of the parenting plan and immediate custody of Billy, alleging that Jerus was

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

physically, verbally and emotionally abusive to Billy; a restraining order was entered *ex parte* on that date enjoining Jerus from removing Billy from Michael's custody. Following a hearing on July 28, the court dismissed the restraining order, restored custody of Billy to Jerus and set the change of custody petition for final hearing. On November 4 the court entered a Temporary Order of Parenting, naming Michael as primary residential parent, granting Jerus residential parenting time, and requiring the parents to undergo counseling to "work on issues of parenting skills, communication skills, parent child relation issues and issues dealing with the child's behavior and discipline." An agreed Permanent Parenting Plan Order was entered on February 13, 2006 naming Michael as primary residential parent and granting Jerus parenting time. On May 10, 2006 Michael filed a motion seeking to suspend Jerus' parenting time or, alternatively, to require that her parenting time be supervised on the ground that Jerus was abusing Billy during her time with him. It does not appear from the record that the motion was responded to or ruled upon by the court.

On July 9, 2008, Denise H. ("Denise"), wife of Michael, filed a sworn "Petition For Emergency Temporary Protective Custody" in the Circuit Court action. The petition alleged that Michael died on February 10, 2008; that Billy was in Denise's care and custody; and that, since the order entered in 2006 naming Michael primary residential parent, Jerus had only seen Billy twice for a total of less than four hours. A Protective Custody Order was entered on August 6, placing temporary care and custody of Billy with the Department of Children's Services ("the Department"). As the factual basis for the action, the order recited:

> The child's father is deceased. The child was living with his father and stepmother, [Denise] at the time of his father's death. The child has remained with the stepmother following the father's death. The child has made statements that he was physically abused while in the care of his mother, [Jerus]. The child expressed fear of living with his mother. The allegations of abuse are significantly severe that the court cannot place the child in the mother's care without further investigation and services by DCS. Due to the father's death and the allegations of abuse against the mother, the child is without a parent to care for him.

The case was transferred to the Juvenile Court for Fentress County.

On September 4, 2008, the Guardian Ad Litem moved to terminate or modify Jerus' visitation on the ground that, based on the Guardian's observation as well as reports to him from the Department's case manager and Billy's therapist at the Children's Center for the Cumberlands, further visitation with Jerus would pose a threat to Billy's safety and emotional well-being. On September 9 the Department filed a similar motion, citing "emotional harm to the child and refusal of the parent to participate in therapeutic visitation which is designed

to rectify problems associated with parenting techniques of the mother." An order was entered effective September 25 in which the parties agreed that Jerus' visitation would be suspended pending Jerus' psychological assessment[2]; the order also granted Billy's maternal grandparents supervised visitation.

The instant case was initiated by the Department on November 19, 2009, by the filing of a petition seeking to terminate Jerus' parental rights. The petition alleged that the conditions which led to Billy's removal persisted and other conditions existed which would cause Billy to be subject to further abuse or neglect, that Jerus was mentally incompetent to provide for her son, and that, as a result, termination of her parental rights was appropriate and in the best interest of the child. Trial was held on August 16 and September 3, 2010[3] and the court entered a Final Decree of Guardianship on March 7, 2011[4] terminating Jerus' parental rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3) and (8). Jerus appeals, contending that the grounds for termination of her rights were not shown by clear and convincing evidence and that termination of her rights was not in the best interest of Billy.[5]

## II. Standard of Review

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170,

---

[2] The order provided that Jerus would initially seek to have the cost of the assessment paid by her insurance or TennCare and, if denied, the Department was authorized to submit a request for payment. On June 19, 2009 the court entered an order approving funds for a psychologist "to conduct the necessary psychological testing of [Jerus] and child, to meet with the child to assess emotional stability and to assess [Jerus'] parenting abilities and to provide testimony in Court regarding the results."

[3] Included as an exhibit to the trial of this case was a transcript of the hearing in the dependent and neglect proceeding held in Fentress County Juvenile Court on May 24, and June 7, 14 and 17, 2010. At the conclusion of this proceeding, the court determined that Billy was dependent and neglected within the meaning of Tenn. Code Ann. § 37-1-102(b)(12). The court also held that the Department had complied with the reasonable efforts requirement and was no longer required to work with Jerus. The court in the termination proceeding relied upon and adopted the findings in the adjudication proceeding; we have likewise reviewed the transcript of the adjudication proceeding in our consideration of the issues raised in this appeal.

[4] The guardianship order was initially entered on September 17, 2010, but was reentered in accordance with the court's grant of Jerus' Rule 60 Motion for Relief.

[5] In a related proceeding, Michael and Denise filed a petition on August 23, 2007 in Fentress County Chancery Court to terminate Jerus' parental rights and to allow Denise to adopt Billy; the ground stated in the petition was that Jerus had abandoned Billy. On August 16, 2010, Denise filed a Notice of Voluntary Dismissal of the petition.

174 (Tenn. 1996). Thus, the state may interfere with parental rights only if there is a compelling state interest. *Nash-Putnam*, 921 S.W.2d at 174–75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982); *Hawk v. Hawk*, 855 S.W.2d 573, 579 (1993). Our termination statues identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B.*, *IV*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. April 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). To support the termination of parental rights, petitioners must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine,* 79 S.W.3d 539, 546 (Tenn. 2002); Tenn. Code Ann. § 36-1-113(c).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769; *Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.*

In light of the heightened standard of proof in these cases, the reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d at 654. As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

## III. Discussion

### A. Termination on the Ground of Mental Incompetence

A parent's rights may be terminated on the ground of mental incompetence if the court determines, by clear and convincing evidence, that the parent's mental condition is impaired to such a degree that the parent cannot adequately provide care and supervision to the child and it is unlikely that the parent will be able to do so in the near future. *See* Tenn. Code Ann.

§ 36-1-113(g)(8)(B).[6] The burden is on DCS to demonstrate two essential facts: (1) that the parent is presently unable to care for the subject children and (2) that the parent is unlikely to be able to care for the children in the near future. Tenn. Code Ann. § 36-1-113(g)(8) (2010). In this case, the trial court held as follows with respect to Jerus' mental incompetence:

> 13. Jerus . . . is incompetent to adequately provide for the further care and supervision of the child because her mental condition is presently so impaired and is so likely to remain so that it would be unlikely that she will be able to assume or resume the care of and responsibility for the child in the near future
> . . . .
> 14. Jerus . . . has been diagnosis [sic] with Adjustment Disorder with Disturbance of Emotions and Conduct, Paranoid Personality Disorder and Narcissistic Personality Disorder. [Jerus] has a history of abusive discipline towards all of her children and all of her children are alienated from her.

Dr. William Sewell, qualified by the court as an expert in clinical psychology and forensic evaluations, testified at trial that he had been asked to perform a forensic evaluation of Jerus to determine her competence to parent Billy. The report of his evaluation was introduced into evidence and states the following diagnostic impressions of Jerus:

---

[6] Tenn. Code Ann. § 36-1-113 (g)(8) provides:

(g)(8)(A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;
(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:
> (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and
> (ii) That termination of parental or guardian rights is in the best interest of the child;
(C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated[;]

Axis I:         (309.4)    Adjustment Disorder with Disturbance of Emotions
                and Conduct
Axis II:        (301.0)   Paranoid Personality Disorder
                (301.81)  Narcissistic Personality Disorder
Axis III:       (V71.09) None
Axis IV:        Major—DCS Parental Rights Removal

With respect to these diagnoses, Dr. Sewell testified:

Q.      I want to go to your diagnostic impression.  Explain first of all what is
        Axis I?

A.      Axis I is the axis that relates to clinical mental illness.  There are two
        types of disorders that psychologists/psychiatrists recognize and deal
        with.  They are the personality type disorders and then the clinical
        disorders.  The top axis relates to clinical disorders.  And in this case
        the diagnosis of adjustment disorder with disturbance of emotions and
        conduct is a clinical disorder.

Q.      What does that diagnosis mean?

A.      It means basically that she is involved in a whole set of circumstances
        that she is attempting to adjust to, and has been attempting to adjust to
        them for some time.  And this diagnosis has been rendered before in
        this case, and she was going through these same kinds of things then.
        What a person that is adjusting to a situation will do if it becomes
        excessive is become disturbed in one way or the other.  In other words,
        their emotions become extreme; they become very anxious; they
        become very angry; then that bleeds over into conduct difficulties such
        as doing things that might be illegal, or doing things that are not in
        conformance with society.

Q.      On Axis II you have two diagnoses.  Paranoid personality disorder,
        what does that mean?

A.      A paranoid personality disorder person has the characteristics of an
        individual that believes when a remark is made and it is a benign
        remark they have a tendency to think that remark is negative; it implies
        the person is being negative toward them when in fact they are not.
        That type of person becomes angry about situations and shows that

-6-

particular anger. They blame others for their own shortcomings as opposed to dealing with things on their own and accepting responsibility for their problems. So those are the primary three basic characteristics.

Q.      When I asked you about Axis, when you alluded to the fact that Axis II refers to personality disorder, what is the main difference between. . . . . . . .

A.      (Interposing) Personalities are developed over time. It becomes a disorder when in fact it is interfering with functioning; it is interfering with life interactions, interactions in society, and the person's relationship to their environment. And those characteristics are basically intractable, or to put it another way and not be so extreme, they are very difficult to change. A person say that is 25 and has a personality disorder, if they develop one, is very likely to be that way ten years after the fact. And they may be able to modulate that, but for the most part those characteristics are going to be prominent throughout their life in one way or another.

Q.      The other diagnosis on Axis II is narcissistic personality disorder. Can you explain that, please?

A.      Yes. Those type persons exaggerate their own self worth. They believe that their interests should be considered and are more important than anyone else's interest around them. They do show very little empathy for others, and they also will in personal relationships have that individual always doing things for them, but very seldom doing things for the other person. A narcissistic personality takes from people in the world, and really severely never gives anything back. And sometimes will . . . . . . well, I don't want to give the example because it is too extreme. But will take real extremes to make sure that their needs are being met even if it means compromising other people's needs.

Q.      What is the likelihood of successful treatment for either of these Axis II diagnoses?

A.      These characteristics are very difficult to change, very unlikely to change at all. Sometimes the characteristics can be modified, and some improvement can be seen, but frequently they never change. They are

there for life. Maybe not in that extreme at one point in time, but possibly that extreme for the entire life.

Q.     Given [Jerus'] statement to you that she felt she had no problems and no need for treatment, how does that affect the likelihood of successful treatment in her particular case?

A.     Those characteristics are very difficult to change within the person, and very difficult for a counselor/therapist/psychiatrist - anyone - to do things to cause change. When someone is very resistant to treatment then it almost ensures no success, and that no treatment will help.

Q.     Did you find [Jerus] to be very resistant?

A.     Yes. She stated so.[7]

Dr. Julian Sanborn, a permanency clinician with Family and Children's Services,[8] testified that she was engaged to do a "bonding assessment" in the case.[9] In a portion of her report, Dr. Sanborn recounts her interviews with Jerus' two older children, who are estranged

---

[7] With respect to Jerus' competency to parent, Dr. Sewell's report states:

Parental competency includes the ability to care for children in the face of inconveniences to the parent, maintaining responsibility for the safety of the children, arranging for safe shelter, using discipline that is not abusive and arranging daily events so that the health of the child is maintained through nutritional care, health and medical care and rest. The parent must have a support system that will provide care for the child in the parent's absence. She has demonstrated repeated failures to plan ahead. She has ignored requests for home studies. [That] [s]he was willing for her son to be placed in her home with a male friend present who had not received an assessment by [Jerus] exhibits an inability or unwillingness to change. She has not made the connection between a child's emotional instability and transitional living. Due to [Jerus'] inability to accept responsibility for her actions, her narcissistic traits and paranoid tendencies, denial of personal problems, rejection of the need for treatment, and the likelihood that she will not benefit from treatment, [Jerus] will not be able to resume independent care of and responsibility for the children [sic] in the near future.

[8] Dr. Sanborn testified that she has a Bachelor's degree in social work, a Master's degree in systematic theology, a doctorate in social ethics, and that she "practice[s] on the doctorate level as a social worker[.]"

[9] This was described in Dr. Sanborn's report as assessing "the attachment between [Billy], his biological mother Jerus . . . and the child's current resource parent, his stepmother, Denise . . .".

from Jerus, and states that the older children "either report being abused by [Jerus] or seeing her abuse Billy. . .". Dr. Sanborn also expresses "significant safety concerns" regarding Billy based on:

> [Jerus'] two older children both report a significant history of abuse with their mother. . . . [Jerus'] eldest reported to a Department of Children's Services case manager that [Jerus] is "very violent" and that "no child would be safe with her." He also informed the case manager that while in DCS foster care as a teen for school issues, he begged to stay in foster care because of his mother's abuse.
> Billy. . . is consistent in his assertion that he would not be safe with his mother.
> Public school officials have reported their concerns to the Department of Children's Services that on one occasion in May 2008 [Jerus] and her fiancee . . . attempted to take Billy from school without any school official's knowledge.[10]

The testimony of Dr. Sewell and Dr. Sanborn, along with the other evidence in the record, clearly and convincingly support the court's finding that Jerus is mentally incompetent to care for Billy and that, because of the nature of her mental impairment, it is unlikely that she could reach the necessary level of competence to assume responsibility for him. Dr. Sewell's diagnosis of Jerus' condition and his opinion as to her competency to parent in light of that diagnosis are unrebutted, as is the proof of Jerus' abusive behavior which is the basis of Dr. Sanborn's safety concerns and which was a part of the court's findings in the dependent and neglect proceeding. The Department met its burden under Tenn. Code Ann. § 36-1-113(g)(8).[11]

---

[10] While the safety concerns expressed by Dr. Sanborn are considered in the resolution of the issue of whether termination of Jerus' parental rights is in Billy's best interest, we consider the factual bases of her concerns–the abusive behavior of Jerus toward her children–in the context of whether Jerus can assume and be responsible for Billy's care within the meaning of Tenn. Code Ann. § 36-1-113 (g)(8) and whether her home is safe and stable within the contemplation of Tenn. Code Ann. § 36-1-113 (g)(3).

[11] Jerus argues that DCS failed to provide her any assistance in addressing her mental health issues. While Tenn. Code Ann. § 37-1-166(g)(1) requires the Department to expend reasonable efforts, defined as the "exercise of reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family," Dr. Sewell testified that Jerus' two diagnoses are "very difficult to change, very unlikely to change" and that the level of her resistance to treatment "almost ensures no success, and . . . no treatment will help." In light of this testimony, the Department was excused from providing such services. *See In re Keisheal N.E.*, No. M2009-02527-COA-R3-PT, 2010 WL 2176104, at *8 (Tenn. Ct. App. Apr. 16, 2010) ("There are cases in which a parent is proven to be so mentally incapacitated that efforts by the Department
(continued...)

B. Termination on the Ground of Persistence of Conditions

Tenn Code Ann. § 36-1-113(g)(3)[12] allows for the termination of parental rights where a child has been removed from the parent's custody for a period of six months and the conditions which led to the child's removal persist. With respect to the persistence of conditions, the trial court held:

> 9. The conditions that led to the removal of the child from the home of Jerus . . . are her past abuse of Billy . . . and the child's extreme fear of his mother.
> 10. The conditions that prevent the child's return to the parent's home are her past abuse of Billy . . . her unresolved mental health issues and the child's extreme fear of his mother.

The evidence relative to the nature and extent of the various personality disorders which are the basis of Jerus' mental impairment also supports the holding that the conditions which led to Billy's removal from her home persist and prevent the safe return of Billy to her home. Significant in this regard is Dr. Sewell's opinion that, in light of the nature of Jerus' condition and her resistence to treatment, there is little likelihood that the conditions would change. The unrebutted concerns of Dr. Sanborn are evidence that continuation of the parent-child relationship diminishes Billy's chances of integration into a safe, stable and permanent home.

---

[11](...continued)
to address the parent's mental health issues would be in vain. In those cases . . . . the Department is excused from exerting efforts to reunify the parent and child.").

[12] Tenn. Code Ann. § 36-1-113(g)(3) provides:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[;]

C. Best Interest

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. The legislature has set out a list of factors at Tenn. Code Ann. § 36-1-113(i) for the courts to follow in determining the child's best interest. The statutory factors are not exhaustive, and the statute does not require every factor to appear before a court can find that termination is in a child's best interest. *See In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *State of Tennessee Dep't of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)).

In determining that termination of Jerus' parental rights was in Billy's best interest, the trial court made the following findings:

1. [Jerus] has not made an adjustment of circumstances, conduct or conditions as to make it safe and in the child's best interest to be in the home of the parent.
2. [Jerus] has failed to effect a lasting adjustment after reasonable efforts by available social agencies for such duration of time that lasting adjustment does not reasonably appear possible.
3. [Jerus] has not maintained regular visitation or other contact with the child. Visitation has been terminated and the mother has not taken the necessary steps to get it reinstated.
4. A meaningful relationship has not otherwise been established between the child and [Jerus].
5. A change of caretaker and physical environment is likely to have a negative effect on the child's emotional, psychological and/or medical condition.
6. [Jerus] has committed brutality and physical, sexual, emotional or psychological abuse or neglect toward other child in the family or household.
7. [Jerus] mental and/or emotional status would be detrimental to the child and/or prevent her from effectively providing safe and stable care and supervision for the child.
8. [Jerus] has not paid a reasonable portion of the child's substitute physical care and maintenance when financially able to do so.
9. [Jerus] has shown little or no interest in the welfare of the child.
10. [Jerus] continues to make lifestyle choices that prevent her from being able to parent the child or to provide a home for the child.
11. The child is placed in relative foster home that wishes to adopt the child.

12. The child has established a strong bond with the relative foster parent.
13. The child has expressed a desire to have parental rights terminated so that he can be adopted.
14. The child's mental health counselor has opined that it is in the child's best interest to establish permanency for the child as soon as possible.
15. The children [sic] need to be released from the stigma of being foster children [sic].

In her brief, Jerus does not take issue with the findings by the court[13] but, rather, concedes that "the best interest of Billy would not be served by immediately placing custody" with her; she asserts that "she is willing to put forth the effort in order to have her son returned to her care." The record, however, is void of any evidence to answer affirmatively the inquiry at Tenn. Code Ann. § 36-1-113(i)(1) as to whether she "has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent."[14] Given the facts of this case, this inquiry is of particular significance.

## IV. Conclusion

For the foregoing reasons, the judgment terminating Jerus' parental rights is AFFIRMED.

_____
RICHARD H. DINKINS, JUDGE

---

[13] Our review of the record confirms that each is supported by clear and convincing evidence.

[14] Jerus also contends, with respect to the best interest inquiry, that had the Department provided her with necessary services assistance, Billy would either be in her custody or eventually returned to her. This argument, however, fails to address her resistence to treatment for her mental condition as well as Dr. Sewell's opinion as to her competency to parent.